716 A.2d 1029

James M. GIFFIN

v.

Donna L. (Valtri) CRANE.

No. 30, Sept. Term, 1997.

Court of Appeals of Maryland.

Sept. 8, 1998.

134

Cynthia E. Young, Annapolis (Jo B. Fogel, Rockville), all on brief for petitioner.

Joseph M. Quirk (John G. Nalls (argued), Rowan, Quirk & Nalls, Rockville; Kelly A. Koermer, Towson; Kevin G. Hessler, Rockville) all on brief for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW and RAKER, JJ., and JOHN F. McAULIFFE and ROBERT L. KARWACKI, Judges (retired), Specially Assigned.

BELL, Chief Judge.

James M. Giffin, the petitioner, and Donna L. (Valtri) Crane, the respondent, the parents of two daughters, Emily Stoughton, born December 22nd, 1982, and Sarah Ellen, born June 26th, 1988, separated in May, 1992, after more than 12 years of marriage. At separation, the petitioner and the parties' two daughters remained in the marital home, while the respondent lived nearby and maintained regular visitation with the children. A year later, the respondent moved to Louisville, Kentucky.

Both parties sought to obtain a divorce. The petitioner filed his complaint for an absolute divorce first, in the Circuit Court for Montgomery County, alleging voluntary separation in excess of one year, or, in the alternative, separation for more than two years. The respondent countered by filing her complaint for divorce on the grounds of voluntary separation in excess of one year. The petitioner and the respondent both asked for custody of the two children, child support, and attorney's fees. The custody and visitation issues were resolved by the parties when they entered into, and placed on the record, a written agreement, "intended to resolve all issues between the parties as to the custody of their children, but to leave to the court decision on the issue of child support and attorney's fees." [1] In addition to maintaining the status quo with respect to the petitioner's being the children's custo-

---

1. The custody agreement provided, in pertinent part:

dian—the petitioner had sole physical custody of both minor children—the agreement provided for joint legal custody. The agreement also contained detailed and comprehensive provisions concerning the respondent's visitation with the children.

The agreement contemplated the possibility of annual reviews of the residential status of the children, to be conducted, at the requesting party's expense, by a mental health professional as to whom the parties agreed. With respect to such reviews, § 1.4 of the agreement thus provided:

"1.1 The Husband shall have sole physical custody of the minor children, and the parties shall share their joint legal custody. The parties will attempt to agree on a mutually acceptable visitation schedule consistent with the activities and schedules of the children, but if they cannot agree, the Wife's access to the children shall be according to the schedule provided in paragraph 1.5.

"Each party shall have reasonable telephone access to the children when the children are with the other parent. The parties agree that they will confine their calls to the time between 7:45 PM and 9:15 PM each evening and after 9:00 AM on weekends. Each party will respect the privacy and time of the other when the children are with the other parent.

"1.2 The parties recognize that their children, Emily and Sarah love them both, that the well-being of their children is the paramount consideration of both parents, and that this well-being requires that their children have the companionship of both parents and that both parents will participate in their children's lives. They will consult with one another on matters of substance involving their children, including but not limited to matters of health and education. Each parent will make a good faith effort to inspire in the minds of their children love and respect for the other parent.

"1.3 Neither party shall unilaterally make any substantial decisions affecting the welfare of the children or enter into any contracts regarding such decisions without prior consultation with the other party. . . .

\* \* \* \* \* \*

"1.6 The parties agree that the Husband shall have the use and possession of the family home under the following terms and conditions:

"a. The parties stipulate that in the event that the Court makes a determination as to the value of marital property, the residence shall be included in such valuation.

"b. If the Court makes a determination as to the value of the residence, then the Husband shall have the option to purchase the Wife's share for a period of two years from the date of this agreement."

"Either party shall have the right at his or her expense after contribution by all available insurance to request a comprehensive review of the residential status of the children by Dr. Mary Donahue or another mental health professional agreed by the parties. The purpose of this review will be determined by Dr. Donahue's using professional standards and her discretion. It is anticipated by the husband that as part of this review Dr. Donahue will consult with teachers and others who have knowledge of the children and their needs. The parties agree that Dr. Donahue will meet with the children within 30 days after the signing of this agreement so as to have a basis of information and that she may make inquiry of the court appointed attorney or others as she sees fit. The parties shall divide the uninsured costs of the first meetings within 30 days.

"The wife desires that Dr. Donahue conduct a review of the children's residential status in 1995. The parties agree that thereafter each will be entitled to request such a review on not more than an annual basis; the parent requesting the review shall be responsible for the payment therefor."

The respondent, having indicated in the agreement her desire that Dr. Mary Donahue conduct such a review, Dr. Donahue proceeded to do so. As a result of her investigation, Dr. Donahue recommended that physical custody of the children be changed from the petitioner to the respondent.[2]

---

**2.** Although, as the petitioner points out, the agreement does not expressly state that a residential status review would result in a recommendation, a recommendation is necessarily implied.

The basis for Dr. Donahue's recommendation was set out in a letter, dated August 16, 1995, to the parties and their respective counsel: "Dear Parties:

"At the request of Ms. Valtri, I am clarifying what I believe is in Emily Giffin's best interests based on two individual sessions with her and one joint session with her father.

"By way of background, I first met Emily in April of 1994. At that time, she expressed both comfort and satisfaction with the living arrangements in place for her. Basically, she spent the academic year with her father in Maryland and the majority of the summer in Kentucky with her mother.

By the time Dr. Donahue had completed her investigation and communicated her recommendation, the court had resolved all the outstanding issues, ordering the respondent to pay child support, declining to award the petitioner attorney's fees, and granting the petitioner a divorce.[3] When the petitioner refused to accept Dr. Donahue's recommendation and relinquish custody of the children, the respondent filed a petition for modification of custody and child support.

---

"In the course of the 94–95 school year, Emily began to experience the need to have more time with her mother. This was somewhat compounded by her school situation. In the fall of 1994, she moved from elementary school to middle school. The behavior of a sizable percentage of the student body in this school has resulted in Emily's feeling somewhat overwhelmed and vulnerable. Her school life was therefore less satisfactory than it had been in the past.

"However, the overriding need I discerned in Emily was the opportunity to know her mother better. Ms. Valtri's work and living situation have changed dramatically since she relocated to Kentucky. From having a job when married to Mr. Giffin which required many hours at work and travel away from home, she now finds herself able to be at home as a full time mother. Emily, developmentally an early adolescent, appears to need to be provided with an opportunity to bond with her mother in a way that was unavailable in the past.

"It is not that her father has failed her in some way as a parent. It is rather that she has an emotional need to be with her mother which was not previously the case. Psycho-dynamically, if Emily perceives that it is her father that has prevented her from finding out the true nature of her relationship with her mother, it is not unlikely that over time, she will come to resent him, should this occur, the positive nature of her current relationship with her father will most likely be damaged.

"Mr. Giffen has raised with me the advisability of Ms. Valtri's relocating back to the Maryland area given that she is no longer employed and her husband's employment is primarily located in Maryland. It is usually preferable for any children of divorce to have their parents living in a reasonable proximity to one another. Such would be the case for this family. However, regardless of where Ms. Valtri resides, I believe Emily needs the opportunity to reside with [the respondent] during this coming academic year and her father the following summer. There are no guarantees. This arrangement may work for Emily and it may not work for her. It remains to be seen. Should it not work, it should be understood that she can return to her present schedule."

**3.** The decree of divorce incorporated the custody agreement, *see* note 1, *supra.*

A hearing was held on the respondent's motion, during which the court, over a span of six days, received testimony from more than twenty witnesses and viewed a number of exhibits, including private investigators' reports and a video-tape. At that hearing, the interests of the children were represented by an attorney appointed by the court.[4] The court granted the respondent's Petition for Modification of Residential Custody, thus modifying the custody agreement by transferring custody of the children from their father to their mother. The court explained its decision as follows:

"The record will reflect in this case what we are about, and what we are about is the issue of custody insofar as residence of the children [is] concerned.

"Now, this was brought about and applied because as a result of an agreement that was made between the parties. There has not been raised in this case nor is there an issue relative to joint custody.

"The evidence in this case exemplifies to the court that both parents are able to communicate with each other concerning the important matters concerning the welfare of the children, and this Court believes they will continue to do so; so joint legal custody is not an issue, and the children remain under that cloak, that there is joint legal custody with both parents over both of the children.

"Now the issue returns as to whether or not there should be a change in the physical custody of the children. This Court feels that the—this concept is governed under Maryland law, that—by the best interest of the child or children, and whether or not there is any material change to circumstances.

"Now, there is no question again in this case that both parents are caring parents, loving parents. There is no doubt by looking at the record that the father, with whom

---

**4.** On February 4, 1994, the court appointed an attorney to represent the children in the divorce proceedings. Again, on August 18, 1995, the same attorney was appointed to represent the children during the modification of custody hearing.

the children have resided this past period of time, is a parent who can attend to all of their physical needs relevant to growing up in a healthy physical situation.

"The Court gleans from its interview with the two children, in addition to what it communicated before and didn't withhold this, but it comes to mind now, that these two very well oriented, adjusted children, who accept the circumstances under which they are living, and also accept that they are loved and cared for by both parents in different ways relative to physical arrangements.

"These children, by no stretch of the imagination, imagine that if they would remain with the father or move to the mother's residence that one parent or the other would gloat over this situation, would consider themselves a winner or a loser, but feel absolutely certain in the love and affection and care that they are entitled to by each parent, and I hope that each parent understands this and abides by those things that these children believe in.

"Sometimes out of the [mouths] of children the wisest things are said. It is interesting that the issue of the young adulthood of Emily in this case did come to the fore. It is also interesting that at the same time Emily expressed the conclusion that she was more able to communicate with her mother. She did not enlarge upon that to me, and there has been no testimony as to what exactly she meant or what specifically she meant insofar as communication, but *the Court gleans from this and the testimony from at least one expert in this case relative to a girl child having particular need for her mother has seemed to come to the fore and is a necessary factor in my determinations in this case.*

"Sarah and Emily have a tremendous bond and should by no stretch of the imagination be separated at all during this time of their life.

*"The Court feels that the best interests of the children and the material change of circumstances, as exemplified by the reaching an age where Emily at the very least exemplifies a need for a female hand, causes the Court to come to the*

*conclusion that the children should reside with their mother.*

"It is interesting that these children would benefit by the influence of their father's fiancee. It is interesting that the Court feels they will benefit from the influence of the husband of the birth mother.

"The children indicate that they adjust and get along well with the children of the husband of their mother and that they could get along with almost anybody.

"The decision of the Court, therefore, is the best interest of the children having expressed what it considers to be a material change of circumstances indicate that the physical custody of the children will be with the mother at this time, that to begin at the end of the school year.

"I would also order and hope that the parties will be able to reach the appropriate agreement, that there be a continuing contact and visitation with the father and that it be extensive as it has been exemplified by that contact with the mother.

"If there are any financial matters that have to be decided, the Court refers those matters to the domestic relations master." (Emphasis added).

The petitioner appealed the judgment to the Court of Special Appeals. He argued in that court that the trial court erred by considering the sex of the parents as a factor in its determination of custody. In an unreported opinion, the intermediate appellate court held, *inter alia*, that "[t]he consideration of gender was a valid consideration in determining residential custody in this case."

In response, the petitioner filed a petition for a writ of certiorari, which this Court granted. In this Court, the petitioner argues, citing Maryland statutory and case law, as well as the Maryland Constitution, that the sex of the parent is not a legitimate consideration in child custody cases. The respondent espouses the opposing view; she argues that the cases upon which the petitioner relies, in particular *Elza v. Elza,* 300 Md. 51, 475 A.2d 1180 (1984), does not "completely eliminate any consideration of gender." Those cases, she

submits, simply upheld the abolition of the maternal preference, consistent with the 1974 amendment to Maryland Code (1957, 1984 Replacement Volume) Art. 72A § 1; [5] they did not preclude the consideration of appropriate biological and psychological differences between parents. Indeed, the respondent asserts that the Court in *Elza* recognized that gender was an appropriate consideration when, after abolishing the maternal preference, it commented:

> "On remand, the chancellor shall explicate more fully the reasons for his decision. In evaluating what would be in the

---

5. That statute reads:
    "The father and mother are the joint natural guardians of their child under eighteen years of age and are jointly and severally charged with its support, care, nurture, welfare and education. They shall have equal powers and duties, and neither parent has any right superior to the right of the other concerning the child's custody.... Where the parents live apart, the court may award the guardianship of the child to either of them, but, in any custody proceeding, neither parent shall be given preference solely because of his or her sex."
    This provision, with the exception of the last sentence specifically forbidding sex discrimination, which was deemed "unnecessary in light of the Maryland Equal Rights Amendment," was superceded by Maryland Code (1984) § 5–203 of the Family Law Article. 1984 Laws of Maryland, Chapter 296:
    " § 5–203. Authority of parents; natural guardianship
    (a)(1) The parents are the joint natural guardians of their minor child.
    (2) A parent is the sole natural guardian of the minor child if the other parent:
    (i) dies;
    (ii) abandons the family; or
    (iii) is incapable of acting as a parent.
    (b) The parents of a minor child:
    (1) are jointly and severally responsible for the child's support, care, nurture, welfare, and education; and
    (2) have the same powers and duties in relation to the child.
    (c) If one or both parents of a minor child is an unemancipated minor, the parents of that minor parent are jointly and severally responsible for any child support for a grandchild that is a recipient of temporary cash assistance to the extent that the minor parent has insufficient financial resources to fulfill the child support responsibility of the minor parent.
    (d)(1) If the parents live apart, a court may award custody of a minor child to either parent or joint custody to both parents.
    (2) Neither parent is presumed to have any right to custody that is superior to the right of the other parent."

child's best interests, the chancellor shall consider, among other factors, Shannon's needs, the relationship of each of her parents to her, and the effect of the biological as well as psychological differences between her parents on her welfare. Given that additional information will undoubtedly be available to the chancellor when he again presides over this custody proceeding, we express no opinion concerning the ultimate resolution of this controversy."

*Elza,* 300 Md. at 60, 475 A.2d at 1185. Finally, the respondent maintains that, even if using sex as a determining factor is not appropriate, the trial court still came to the correct decision when it awarded custody to the mother and, thus, the judgment of the Court of Special Appeals should be affirmed.[6]

## I

The question that we must decide is whether, in a child custody proceeding, the sex of either parent is a legitimate and proper consideration in determining which of them is the appropriate residential custodian. It is an issue in this case because of some of the language the trial court used to explain its custody decision. As we have seen, the court opined:

"[T]he Court gleans from ... the testimony from at least one expert in this case relative to a girl child having particular need for her mother has seemed to come to the fore and is a necessary factor in my determinations in this case ... The Court feels that the best interests of the children ... as exemplified by the reaching an age where Emily at the very least exemplifies a need for a female

---

**6.** Counsel for the children agrees with the respondent, although he arrives at the result by a somewhat different route. He argues that the petitioner unfairly and inaccurately characterized the basis of the trial court's decision as "the product of improper consideration of gender-based criteria" rather than "proper deference to the ability of the parties' older daughter to communicate better with her mother about important issues." Nor does counsel believe that the Equal Rights Amendment precludes the consideration of sex as a factor in a contested custody case when the evidence raises sex and related developmental and emotional issues.

hand, causes the Court to come to the conclusion that the children should reside with their mother."

The expert to whom the trial court apparently was referring, Dr. Joseph Poirier, expert witness for the petitioner, when questioned by the children's counsel, testified as follows.

"Q: In comparison, mother was much warmer, I think you testified to?

"A: In [Emily's] perception, yes.

"Q: Okay.

"A: Now, again, that may be of that mother/daughter attachment thing, too. I mean, I did not find Mr. Giffin emotionally detached.

\*  \*  \*  \*  \*  \*

"Q: And that is because [Emily] perceives him as being more emotionally aloof, to use those same words?

"A: I would not characterize it that way. I could not tell you if [Emily] is more comfortable with the mom. That may be explainable just in terms of that specialized relationship she has. You know, I mean, If I can look at my own kids, when my kids were adolescents, they were much more comfortable going to my wife. There is a developmental thing there and it's not really necessarily a positive or a negative characterization against or on behalf of either parenting figure.

"Q: But the literature clearly recognizes the significance of that developmental factor that you were just talking about—

"A: Oh, yes.

"Q: —and the identification with the same sex parent is pretty common with someone this age; correct?

"A: And again, as I have already testified, it is something that ebbs and flows, yes."

The determination of which parent should be awarded custody of a minor child rests within the sound discretion of the trial court. *Robinson v. Robinson*, 328 Md. 507, 513, 615 A.2d 1190, 1193 (1992); *In re Jessica M.*, 312 Md. 93, 110, 538

A.2d 305, 313 (1988); *Davis v. Davis* 280 Md. 119, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977); *Ross v. Hoffman,* 280 Md. 172, 185, 372 A.2d 582, 590–91 (1977). The court's exercise of discretion must be guided first, and foremost, by what it believes would promote the child's best interest, which, in custody disputes, is of transcendent importance. *Elza,* 300 Md. at 60, 475 A.2d at 1183. *See Kemp v. Kemp,* 287 Md. 165, 170, 411 A.2d 1028, 1031 (1980); *Stancill v. Stancill,* 286 Md. 530, 534, 408 A.2d 1030, 1033 (1979); *Ross,* 280 Md. at 174–75, 372 A.2d at 585; *Krebs v. Krebs,* 255 Md. 264, 266, 257 A.2d 428, 429 (1969); *see generally, Montgomery County Department of Social Services et al. v. Sanders,* 38 Md.App. 406, 381 A.2d 1154 (1977). Determining what is in the best interest of the child is by no means easy. As Chief Judge Gilbert speaking for the Court of Special Appeals in *Sanders* recognized, "there is no such thing as a simple custody case." *Id.* at 414, 381 A.2d at 1160. He further pointed out in that same case:

"Unfortunately, there is no litmus paper test that provides a quick and relatively easy answer to custody matters. Present methods for determining a child's best interest are time-consuming, involve a multitude of intangible factors that ofttimes are ambiguous. The best interest standard is an amorphous notion, varying with each individual case, and resulting in its being open to attack as little more than judicial prognostication. The fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess."

*Id.* at 419, 381 A.2d at 1163. *See also Domingues v. Johnson,* 323 Md. 486, 501, 593 A.2d 1133, 1140 (1991) ("Indeed, the very difficulty of the decision-making process in custody cases flows in large part from the uniqueness of each case, the extraordinarily broad spectrum of facts that may have to be considered in any given case, and the inherent difficulty of formulating bright-line rules of universal applicability in this

area of the law."). Moreover, there are many factors, to be taken as a whole, that the court must consider when gauging what is in a child's best interest. *See Sanders,* 38 Md.App. at 420, 381 A.2d at 1163. *See also Palmore v. Sidoti,* 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421, 425 (1984). Both before and after 1972, when Maryland adopted the Equal Rights Amendment, this Court, as the respondent notes, has listed among the factors to be considered the age, health and sex of the child. See *Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442, 446 (1960) and *Queen v. Queen,* 308 Md. 574, 587–88, 521 A.2d 320, 327 (1987). In addition, in *Elza,* this Court recognized that "biological and psychological differences between parents" may be considered in determining the best interest of children for custody purposes. 300 Md. at 59, 475 A.2d at 1184.

As a threshold matter, the issue must be addressed as to whether the trial court did, in fact, consider gender as a determining factor in its custody decision. To be sure, the court, on this record, could have resolved the custody issue on a basis other than gender. It is conceivable, in fact, that the communication issue may have been decisive. Indeed, that appears to be the position taken by the children's counsel. The record in this case belies that position, however.

After acknowledging the test for determining the custody of the children, the trial court recognized that "both parents are caring parents, loving parents." It also found that "[t]here is no doubt ... that the father, with whom the children have resided this past period of time, is a parent who can attend to all of their physical needs relevant to growing up in a healthy physical situation." Focusing on the fact that Emily informed the court that she could more easily communicate with her mother, but admitting that she did not further elaborate and that there was no testimony as to the full significance of that fact, the trial court concluded, based on the testimony of one of the expert witnesses, that Emily was "a girl child having a particular need for her mother." Explaining why that factor was a necessary one in its determination, the court stated that "the reaching an age where Emily at the very least exempli-

fies a need for a female hand," thus, concluding that the need for a female hand constitutes a material change in circumstances, which should precipitate awarding custody to the respondent.

When one considers the trial court's explanation of its decision, it is clear, unambiguously so, that the court was relying on the respondent's gender as the decisive basis for modifying the custody order. While the ability to communicate better with one parent over the other may be cause to award custody to that parent, that is not what occurred in this case and it is certainly not what the trial court said that it was doing. With no more information than that Emily indicated an ability more easily to communicate with her mother and despite the outstanding job that the court acknowledged that the petitioner had done in raising his daughters, the trial court was persuaded by the testimony of one of the experts that she was a girl child who has a particular need for her mother and for a female hand. Because, as the court itself acknowledged, there was no specific or particularized testimony or information concerning the nature of the communication problem, its conclusion could not have been the product of testimony about the particular child and her needs and relationship with the parties. As the petitioner points out, citing *McAndrew v. McAndrew*, 39 Md.App. 1, 9, 382 A.2d 1081, 1086 (1978):

"The Chancellor did not conduct an individualized examination of the evidence or speak in terms of specific facts. He did not describe specific characteristics that these children needed in a custodial parent, he merely said a girl needs her mother. He did not describe specific attributes he saw in the Appellee or explain why he thought that she could better meet the needs of the children, except that she has 'a female hand.' In short, he 'presumed [appellee] to be clothed with ... a particular characteristic merely because [she] is ... female.' "

The petitioner also cites to Md.Code (1957, 1991 Repl.Vol., 1997 Supp.) § 5–203 of the Family Law Article, and to the Equal Rights Amendment for support of his position.

**148**

■ Maryland's Equal Rights Amendment, Article 46 of the Maryland Declaration of Rights, provides: "Equality of rights under the law shall not be abridged or denied because of sex." This article was ratified by the electorate at the general election held on November 7, 1972. To ascertain the mandate of this constitutional amendment, we look first to the "natural and ordinary signification" of its language. *Rand v. Rand,* 280 Md. 508, 511–12, 374 A.2d 900, 902 (1977), quoting *Balto. Gas & Elect. Co. v. Board,* 278 Md. 26, 358 A.2d 241 (1976). If that language is clear and unambiguous, we need not look elsewhere. *Rand,* 280 Md. at 511, 374 A.2d at 902, citing *Harden v. Mass Transit Adm.,* 277 Md. 399, 354 A.2d 817 (1976); *Md.-Nat'l Cap. P. & P. v. Rockville,* 272 Md. 550, 325 A.2d 748 (1974). The words of the Equal Rights Amendment are clear, unambiguous and unequivocal; the Amendment "mandated equality of rights under the law and rendered state-sanctioned sex-based classifications suspect." *State v. Burning Tree Club, Inc.,* 315 Md. 254, 269, 554 A.2d 366, 374, cert. denied, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). We also said in that case:

> "Plainly, under prior holdings of this Court, state action providing for segregation based upon sex, absent substantial justification, violates the E.R.A., just as segregation based upon race violates the Fourteenth Amendment."

*Id.* at 295, 554 A.2d 366, citing *Burning Tree Club v. Bainum,* 305 Md. 53, 95–98, 501 A.2d 817 (1985) (Eldridge, J. concurring and dissenting). Indeed, this Court has opined that the Amendment can only mean that sex is not, and can not be, a factor in the enjoyment or the determination of legal rights. *Rand,* 280 Md. at 513, 374 A.2d at 902–03, citing Brown, Emerson, Falk, and Freedman, The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871 (1971).

■ The basic principle of the Maryland Equal Rights Amendment, thus, is that sex is not a permissible factor in determining the legal rights of women, or men, so that the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other,

*Burning Tree Club v. Bainum,* 305 Md. 53, 64, 501 A.2d 817, 822, (Murphy, C.J.), citing 80 Yale L.J. 871, 889 (1971); that amendment generally invalidates governmental action which imposes a burden on, or grants a benefit to, one sex but not the other one. *Id.* at 70, 501 A.2d at 825 (Murphy, C.J.). Therefore, Chief Judge Murphy noted in *Burning Tree Club v. Bainum,* that this constitutional provision drastically altered traditional views of the validity of sex-based classifications imposed under the law, and was cogent evidence that the people of Maryland were fully committed to equal rights for men and women. *Id.* at 64, 501 A.2d at 822 (Murphy, C.J.). And the equality between the sexes demanded by the Maryland Equal Rights Amendment focuses on "rights" of individuals "under the law," which encompasses all forms of privileges, immunities, benefits and responsibilities of citizens. *Id.* at 70, 501 A.2d at 825, (Murphy, C.J.), quoting 80 Yale L.J. at 908. As to these, the Maryland E.R.A. absolutely forbids the determination of such "rights," as may be accorded by law, solely on the basis of one's sex, i.e., sex is an impermissible factor in making any such determination. *See Rand v. Rand,* 280 Md. at 513, 374 A.2d at 903, *Kline v. Ansell,* 287 Md. 585, 593, 414 A.2d 929, 932 (1980); *Turner v. State,* 299 Md. 565, 574, 474 A.2d 1297, 1302 (1984). It was in this context that the *Chief* Judge Murphy opinion in *Burning Tree Club v. Bainum* observed that the Equal Rights Amendment's guarantee of equality of rights under the law "can only mean that sex is not a factor." 305 Md. at 64, 501 A.2d at 822 (Murphy, C.J.), citing *Rand,* 280 Md. at 512, 374 A.2d at 903.

It is clear, therefore, that the Equal Rights Amendment flatly prohibits gender-based classifications, absent substantial justification, whether contained in legislative enactments, governmental policies, or by application of common law rules. *See State v.Burning Tree Club,* 315 Md. at 295–96, 554 A.2d at 386–87; *Rand, supra,* 280 Md. at 516, 374 A.2d at 900; *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981); *Turner,* 299 Md. at 574, 474 A.2d at 1302. Other jurisdictions have reached the same conclusion. For instance,

in *Williams v. School District,* 998 F.2d 168, the United States Court of Appeals, for the Third Circuit, pointed out that "[t]he Pennsylvania E.R.A. provides that '[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.' The provision applies equally to men and to women, and, according to the Supreme Court of Pennsylvania, its purpose is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman. In this Commonwealth, sex may no longer be accepted as an exclusive classifying tool."

*Id.* at 177, citing *Henderson v. Henderson,* 458 Pa. 97, 327 A.2d 60, 62 (1974) (invalidating statute permitting only women to receive alimony after divorce); *Swidzinski v. Schultz,* 342 Pa.Super. 422, 493 A.2d 93, 95–96 (1985); *Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851, 855 (1974) (invalidating criminal statute prohibiting minimum sentences for women while allowing them for men); *Hartford Accident & Indem. Co. v. Insurance Comm'r,* 505 Pa. 571, 482 A.2d 542 (1984) (striking differential insurance rates for the sexes); *Commonwealth v. Santiago,* 462 Pa. 216, 340 A.2d 440 (1975) (invalidating presumption that wife who commits crime in the presence of her husband was coerced); *Hopkins v. Blanco,* 457 Pa. 90, 320 A.2d 139 (1974) (extending to married women the right to claim damages for loss of consortium). *See* Pa. Const. Art. I, § 28. *See also Schreiner v. Fruit,* 519 P.2d 462 (Alaska 1974) ( to grant men but not women the right to sue for loss of consortium would be unconstitutional); *People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98 (1974) (different age for juvenile classification of boys than girls violates the E.R.A.); *Page v. Welfare Commissioner,* 170 Conn. 258, 365 A.2d 1118, 1124 (1976)(E.R.A. violated when a husband, but not a wife, was allowed deductions for dependent children when calculating

the amount that must be paid to help support a parent on welfare.); *Schilling v. Bedford Cty. Memorial Hosp.*, 225 Va. 539, 303 S.E.2d 905 (1983) (necessaries doctrine violated E.R.A. because it obligates a husband to pay for his wife's necessaries, but does not similarly obligate the wife); *R.McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666 (1980) (statute granting a natural mother the right to bring an action for determination of paternity, but not granting the father the same right, violated the Colorado E.R.A.); *Com. v. King*, 374 Mass. 5, 372 N.E.2d 196 (1977) (punishment of female, but not male, prostitutes violates the E.R.A.).

Although this Court has not had the occasion to address the issue this case presents, our cases since the adoption of the Equal Rights Amendment and the Legislature's action in enacting the Family Law Article make clear what the proper result should be. As we have seen, this Court has interpreted the Amendment's "broad, sweeping mandatory language," *see Rand*, 280 Md. at 515, 374 A.2d at 904–05, as the expression of Maryland's commitment to equal rights for men and women and the statement of its intention to alter traditional attitudes with respect to such rights. *Id.* at 515–16, 374 A.2d at 904–05. *See Insurance Com'r of State of Md. v. Equitable Life Assur. Soc. of U.S.*, 339 Md. 596, 664 A.2d 862 (1995); *Tyler v. State*, 330 Md. 261, 265–66, 623 A.2d 648, 651 (1993).

At issue in *Rand* was the validity, in light of the Maryland Equal Rights Amendment, of the common law rule that placed the primary liability for the support of minor children on the father. Holding the rule irreconcilable with the E.R.A., we concluded that the "parental obligation for child support is not primarily an obligation of the father, but is one shared by both parents." *Rand*, 280 Md. at 516, 374 A.2d at 905. Another common law rule was at issue in *Kline v. Ansell*, 287 Md. 585, 593, 414 A.2d 929, 933 (1980), that only men could sue or be sued for criminal conversation. We held that the rule violated the Equal Rights Amendment, explaining that it "provides different benefits for and imposes different burdens upon its citizens based solely upon their sex." *Id.* In *Condore v. Prince George's Co.*, 289 Md. 516, 425 A.2d 1011 (1981), we

held that the common law doctrine of necessaries, which obligated the husband, but not the wife, to pay for his spouse's necessaries, violated the Equal Rights Amendment. Noting the Court's consistent holdings "that a law that imposes different benefits and different burdens upon persons based solely upon their sex violates the Maryland E.R.A.," this Court, in *Turner*, 299 Md. at 576, 474 A.2d at 1302, invalidated a criminal statute which prohibited the employment by taverns of so-called female sitters to solicit customers to purchase drinks. We pointed out that, under the statute, a man could be employed as a sitter but a woman could not. *Id.*

This Court's custody decision in *Elza v. Elza*, 300 Md. 51, 475 A.2d 1180 (1984) is also instructive, as is the Legislature's recodification, as a part of Code Revision, of former Article 72A § 1. The issue in *Elza* was the validity of the maternal preference presumption and whether the trial court in a child custody proceeding erred in basing its award of custody to the mother solely on it. Stating that the 1974 amendment to Art. 72A, § 1, by providing, clearly and unambiguously, that "neither parent shall be given preference solely because of his or her sex," expressed the intent of the General Assembly to eradicate sex as a factor in child custody proceedings, this Court abolished the maternal preference doctrine in this State because it permitted custody to be awarded solely on the basis of the mother's sex.[7] *See also McAndrew*, 39 Md.App. 1, 382 A.2d 1081 (1978), upon which the intermediate court relied and found persuasive.[8]

---

7. As the Court pointed out, neither party raised the issue of whether application of the maternal preference doctrine in child custody proceedings violated the Equal Rights Amendment, and thus the Court did not address it. *Elza v. Elza*, 300 Md. 51, 54, n. 1, 475 A.2d 1180, 1181, n. 1 (1984). Nevertheless, the Court noted "that this case involves the same provision which was before this Court in *Rand v. Rand*, 280 Md. 508, 516, 374 A.2d 900 (1977) (clear language of Art. 72A, § 1 combined with adoption of the E.R.A. mandated conclusion that 'Child support awards must be made on a sexless basis.')." *Id.*

8. The court in *McAndrew v. McAndrew*, 39 Md.App. 1, 382 A.2d 1081 (1978), stated, "This is not to suggest that the best interests of the child may not require a consideration of the biological ... differences be-

The Pennsylvania Supreme Court, in *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977), held that the "tender years" doctrine, which is Pennsylvania's equivalent of Maryland's maternal preference doctrine, was abolished by that State's E.R.A. The "tender years" doctrine, in essence, maintains that, in a child custody dispute, where a child is of tender years, the mother is presumed to be the more fit parent. The court in *Spriggs* struck down that presumption, stating:

"[W]e note that in reaching its conclusion that custody should be awarded to the mother, the majority in the Superior Court relied heavily upon the 'tender years doctrine'. We ... question the legitimacy of a doctrine that is predicated upon traditional or stereotypic roles of men and women in a marital union. Whether the tender years doctrine is employed to create a presumption which requires the male parent to overcome its effect by presenting compelling contrary evidence of a particular nature, or merely as a makeshift where the scales are relatively balanced, such a view is offensive to the concept of the equality of the sexes which we have embraced as a constitutional principle within this jurisdiction. Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of 'presumptions'. Instead, we believe that our courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the Court."

*Id.* at 299–300, 368 A.2d at 639–640, citing *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1973); *Commonwealth ex rel. Logue v. Logue,* 194 Pa.Super. 210, 166 A.2d 60 (1960); *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Veihdef-*

tween the parents ... to the extent that they bear upon their ability to provide the care needed by the child at the time." *Id.* at 8, 382 A.2d at 1083. The biology of a parent, however, is not synonymous with the sex of the parent.

*fer v. Veihdeffer,* 235 Pa.Super. 447, 344 A.2d 613 (1975); *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974).

During the legislative session of 1984, the Legislature recodified Art. 72A § 1 as § 5–203 during the adoption of the Family Law Article.[9] *See* 1984 Laws of Maryland, Chapter 296, p.1925. Rather than recodify the provision without change, the Legislature deleted the phrase, which was found decisive in *Elza* and *McAndrew,* "in any custody proceeding, neither parent shall be given preference solely because of his or her sex," the Revisor's Note indicating that the phrase was "deleted as unnecessary in light of the Maryland Equal Rights Amendment." Of course, the Legislature is presumed to be aware of decisions of the Court of Appeals, *Romm v. Flax,* 340 Md. 690, 698, 668 A.2d 1, 4 (1995); *Harris v. State,* 331 Md. 137, 150, 626 A.2d 946, 952 (1993); *State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990); *Mayor and City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984), and the Legislature's inaction or action to effect a statutory change must be considered in that light. Being aware of this Court's decision in *Elza* and its Equal Rights Amendment jurisprudence, it is clear that the Legislature not only understands that the amendment prohibits gender preference and disparity based on gender, but also agrees, and intends, that it should.

The respondent argues that even if the trial court should not have used gender in reaching its determination, that court still reached the correct decision when it awarded residential custody to the mother and, therefore, its judgment should be affirmed. She is contending in effect that any error was harmless. We do not agree. Nor will this Court independently review the record and make the best interest determination in the first instance. That matter, being addressed to the discretion of the trial court, ought be resolved by the trial court in the first instance.

---

**9.** *See also* note 5, *supra.*

■ The trial court erred, as a matter of law, in the instant case; it assumed that the respondent necessarily would be a better custodian solely because she has a female hand, and that a girl child of a certain age has a particular and specific need to be with her same sex parent. In so doing, as in *Elza*, the trial court applied an invalid legal principle. A review of the record of the hearing reveals, again, much as in the case of *Elza*, that, but for the trial court's perception of the need for a female hand for a girl child of Emily's age, that it believed each parent would be a proper and fit custodian. Indeed, that sex-based reason for the custody award to the respondent was the only reason given for the court's decision. Therefore, we will remand the case to the circuit court for further proceedings in that court.

The trial court will be required, of course, on remand once again to consider the best interest of the children in deciding their custody and it must fully set forth and explain the reasons for its decision, consistent with this opinion. As in *Elza*, because additional information will be available and may be presented to the trial court on remand, we express no opinion concerning the ultimate resolution of this custody matter.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.

McAULIFFE, Judge, dissenting.

I cannot agree that the record in this case discloses an impermissible use of gender by the chancellor in the determination of this custody dispute. I would agree that the oral opinion of the chancellor, delivered from the bench after six days of trial, is perhaps inelegant and lacking in as complete a discussion of the rationale for the decision as may have been desired, but viewed in the context of the testimony and of

prior statements of the chancellor, it is clear to me that the references to gender related to appropriate considerations.

I do not understand the majority to hold that consideration of gender is always inappropriate in a custody case. One of the significant issues in this case was the ability of the older daughter, Emily, to communicate effectively with one parent or the other. There was testimony that Emily had difficulty communicating with her father regarding certain matters of importance to her, but communicated readily with her mother on those matters, and that this was a strong reason for her stated desire to live with her mother. It was an expert witness who testified that it is not at all uncommon for children of Emily's age to closely identify with, and more effectively communicate with, a same-sex parent. Dr. Mary Donahue, who testified on behalf of the mother, referred to "more a psychological issue and the need to bond with her mother psychologically based on where she was in the development issues" and "a major emotional need to be with her mom." Dr. Joseph Poirier, who testified on behalf of the father, referred to "a natural or expected bonding of a teenage ... a young adolescent girl with her own same-sex parent;" ... "that mother/daughter attachment thing ...;" and, "that specialized relationship she has with her mother."

What is important to understand in this case is that the witnesses were not saying that an adolescent daughter is always better able to communicate with her mother than father, or that there is always an emotional need of a daughter to be with her mother. What was said was in the context of *this mother* and *this daughter*, and not some stereotypical figures. In discussing the particular need that existed in this case, the witnesses simply noted that the situation was hardly atypical, and often occurred between a child and the same-sex parent. This is a far cry from establishing a preference or presumption based on gender.

*Elza v. Elza,* 300 Md. 51, 475 A.2d 1180 (1984) does not hold that the sex of the child and the sex of the parent may never

be considered or mentioned. The holding in that case is clearly stated:

Therefore, we hold that the maternal preference doctrine is abolished in this State because it permits an award of custody to be made solely on the basis of the mother's sex. *Id.*, 300 Md. at 59, 475 A.2d 1180.

Judges should be precluded from concluding that a special relationship, bonding, or ability to communicate between a parent and a child exists solely on the basis that the parent and child are of the same sex; judges should not be precluded from finding the existence of such a relationship from the facts of the case, even though that relationship may have resulted in part from the reality that the parent and child are of the same sex.

In his brief oral opinion, the chancellor referred to an earlier statement he had made following his interview of the children. At that earlier time, the chancellor said:

The only reason that Emily gave for wanting to go to Kentucky was the same reason that you have expressed that she expressed—that was expressed from the stand, that she finds it . . . the things she likes to talk to her mother about, she finds it easier to talk to her mother.

One problem she has with dad is that when there is a disagreement of sorts, it requires a total examination and exhaustive study as to what is happening and so on. . . .

There was testimony that when Emily was concerned about the conduct of students at her school she turned only to her mother to discuss those concerns. Dr. Poirier characterized Emily's description of her father as being more emotionally aloof than her mother, who was much warmer. Dr. Donahue testified that "it's clear from the conversation she's had with me that she talks with her mother about a variety of things that are important to her, and I do not believe she shares those same things with her dad." Dr. Donahue felt that was significant "because I think it's in a child's best interest to be with the parent with whom they feel most comfortable sharing their lives, the problems in their lives, or whatever are the

things that are going on day to day." Thus, when the chancellor in his opinion referred to the testimony of Emily that she was better able to communicate with her mother and said, "The court gleans from this and the testimony from at least one expert in this case relative to a girl child having a particular need for her mother has seemed to come to the fore and is a necessary factor in my determinations in this case" he was speaking speaking specifically of this daughter and this mother. He went on to say that

> the court feels that the best interests of the children and the material change of circumstances, as exemplified by the reaching [of] an age where Emily at the very least exemplifies the need for a female hand, causes the court to come to the conclusion that the children should reside with their mother.

Again, the chancellor was speaking specifically of Emily and of her needs and, while it would have been preferable for him to refer to "her mother's hand" instead of "a female hand," I believe that in the context of this case, it is clear the chancellor was not utilizing stereotypical values of gender to decide the issue of custody.

In addition to my disagreement with the interpretation the majority gives to the chancellor's remarks, I dissent because I am concerned that the tone of the majority's opinion may cause trial judges to shy away from perfectly valid and important case-specific findings merely because those findings reflect relationships and needs that are consistent with a particular parent and child being of the same sex.

RAKER and KARWACKI, JJ., join in this dissent.