813 A.2d 334

**CHILD SUPPORT ENFORCEMENT ADMINISTRATION et al.**

v.

**Daniel N. SHEHAN.**

**No. 1754, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Dec. 23, 2002.

Barbara Strong Goss, Assistant Attorney General(J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellants.

No brief or appearance by appellee's counsel.

Argued before HOLLANDER, SALMON and KENNEY, JJ.

KENNEY, Judge.

The Anne Arundel County Domestic Relations Division ("DRD") appeals the decision of the Circuit Court for Anne Arundel County, which voided the child support obligation of appellee, Daniel Shehan, because he cohabitated with the child's mother, Vickie Garland Goddard, after the child support order was issued. Neither Shehan nor Goddard individually has participated in this appeal. DRD poses two questions on appeal, which we have consolidated into one:

I. Did the circuit court err in holding that cohabitation of unmarried parents renders null and void support orders and any agreement reaffirming the unmarried father's duty to support premised upon a finding of paternity?

For the reasons below, we shall reverse the decision of the circuit court.

## Factual and Procedural History

Goddard and Shehan lived together in Maryland and are the parents of Carly Shehan (the "child"), the oldest of the couple's three children. The child was born on July 9, 1985. Because of continuing difficulties in their relationship, Goddard planned to move to Connecticut to reside with her sister. On January 23, 1986, Goddard filed a paternity petition against Shehan regarding the child.

Shortly thereafter, on March 4, 1986, Shehan signed an agreement (the "Agreement") admitting paternity. The Agreement provided that Shehan's child support would continue until the child "becomes 18 years of age, dies, marries, or becomes self-supporting, whichever event occurs first." It also noted that Shehan was "unemployed and has agreed that this matter is to be reviewed in six weeks for a specific amount of support." Although Goddard and Shehan were then living together, Goddard informed DRD that they lived apart.

On May 12, 1986, Goddard and Shehan signed a consent order, pursuant to which Shehan agreed to pay child support to DRD in the amount of $25.00 per week for the child and to inform the agency of his whereabouts.[1] At that time, he believed that "things were going to be over" between them.

Approximately two weeks after the consent order was signed, Goddard moved to Connecticut. On June 21, 1986,

---

1. *See* Md.Code (1984, 1999 Repl.Vol.) §§ 5–1034 (permitting payment to the "mother or any other person" or to the "appropriate support enforcement agency"), and 5–1035(b)(2) ("the court may order any party ... to report to the court any change of address") of the Family Law Article.

Goddard gave birth to the couple's second child. Shortly thereafter, she informed Shehan about the birth. He then moved to Connecticut and lived with Goddard. Although the record is unclear, Shehan testified that, from 1986 through the "next 11 or 12 years," appellant moved back and forth between Maryland and Connecticut, where he resided with Goddard. During Shehan's periodic stays in Connecticut, which are not detailed in the record, Goddard became pregnant with the couple's third child, who was born on January 24, 1992.[2] Shehan made no child support payments and did not inform DRD of his periodic stays in Connecticut. DRD filed a petition requesting that Shehan be found in contempt.

According to Shehan, from 1986 until 1998, he provided "a little more than" $25.00 per week for child support and also contributed to the rent. Shehan testified that Goddard left Connecticut and moved to Tennessee in 1998. The accuracy of that testimony, however, was disputed at oral argument by DRD's statement that sometime during 1995, Goddard married and was living in Tennessee and that, in about 1994, Shehan married and was living in Maryland.

There is no evidence in the record that Goddard personally sought enforcement of the child support order. Because DRD had not received child support payments since the parties executed the Agreement, it notified Shehan in February 2000 that it would suspend his driver's license. In response, Shehan entered into an arrearages payment schedule requiring him to pay $25.00 per week for child support and $25.00 per week toward the arrearages. Shehan also made an initial payment of $100.00 to DRD.

When Goddard received a copy of the notice to suspend Shehan's driver's license, she telephoned DRD on March 21, 2000; the substance of that conversation is not part of the record. Shehan did not pay the child support payments last agreed to and, on September 28, 2000, the circuit court again

---

**2.** Whether appellant has a formal support obligation for the second and third child is not clear from the record in this case.

ordered that Shehan pay $25.00 per week for child support and also pay $25.00 per week toward the arrearages. At that point, Shehan informed DRD that he and Goddard had lived together in Connecticut for twelve years.

Because Shehan did not make any further payments, DRD initiated contempt proceedings in October 2000, pursuant to Md.Code (1984, 1999 Repl.Vol.), § 5–1041 of the Family Law Article ("FL"). On October 12, 2000, the circuit court issued a show cause order requiring Shehan to explain why he should not be held in contempt for not paying his child support.[3] On November 30, 2000, Shehan failed to appear for the contempt hearing and the court issued a bench warrant setting bond in the amount of $18,500.

The circuit court issued a second show cause order on December 15, 2000, requiring Shehan to appear before a special master on January 11, 2001. At that hearing, the contempt case was continued and set for review in April 2001. Goddard apparently was made aware of the proceeding by a letter sent by Shehan's counsel, which requested that she relinquish any claim to child support. Goddard did not consent to that request.

On April 12, 2001, the contempt hearing was continued to May 2001. At that time, Shehan owed more than $19,000. Four days later, Shehan filed a motion to terminate the child support order and dismiss the arrearages. On May 7, 2001, a hearing was held before a special master. Goddard did not receive notification of that hearing and therefore did not attend. During that hearing, the master stated:

> [T]hat raises an interesting question which I have some reservation or thoughts about. DRD does not represent [Goddard]. They enforce support orders. Is [Goddard] even a party to this particular proceeding, and to any

---

3. FL § 5–1041(b) states: "If an individual fails to make a support payment ordered under this subtitle, the individual shall be served with an order that directs the individual to show cause why that individual should not be held in contempt."

decision I make today, and recommend and sign off by a Judge? Does that bind her, as she is not here?

Despite a concern that Goddard was not present, the master made the following findings and conclusions:

The parties' second child was born on 21 June 1986. Shortly thereafter [Shehan] moved to Connecticut to live with [Goddard] and the two children and they lived thereafter as a family. [Shehan] provided all of the support for [Goddard] and the children, and his financial support of [the child] exceeded $25 per week. In 1998 [Goddard] took all of the parties' belongings, left with the children and moved to Tennessee. [Shehan] then returned to Maryland. [Shehan] has not seen the children since the separation and only recently learned of their actual location.

\* \* \*

There is no question but that the resumption of cohabitation by the parties for some 12 years was a *bona fide* reconciliation. Therefore, the 1986 support order was nullified upon the parties' reconciliation in Connecticut. And as acknowledged by DRD's counsel,[4] as there was no valid support order in place, the Consent order of 15 September 2000 is void *nunc pro tunc.*

[4] It is, therefore, not necessary to address the issue of [Shehan's] right to a set off for the support he actually provided [the child] during the period of cohabitaion. *Coffman v. Hayes,* 259 Md. 708, 270 A.2d 808 (1970); *Smith v. Smith,* 79 Md.App. 650, 558 A.2d 798 (1989).

The master recommended that Shehan not be held in contempt and that the court void the 1986 child support order and the subsequent order regarding Shehan's arrearages. DRD filed timely exceptions to the master's findings and recommendations.

On August 22, 2001, the circuit court held a hearing on the exceptions. Again, Goddard was not notified, was not present at the hearing, was not represented by counsel, and did not have an opportunity to contest Shehan's testimony.

On September 12, 2001, the court ratified the master's recommendations, issuing an order not holding Shehan in contempt and ordering that the "Consent order of Modification entered 12 May 1986 is void; and the Consent Order entered 28 September 2000 is void." This appeal was filed on October 4, 2001.

### Standard of Review

█ Review by [an appellate court] involves interpreting whether the circuit court's order was legally correct. While child support orders are generally within the sound discretion of the trial court, *see Beckman v. Boggs,* 337 Md. 688, 703, 655 A.2d 901, 908 (1995) (discussing the circuit court's discretion in family matters, with specific reference to visitation orders); *Giffin v. Crane,* 351 Md. 133, 144, 716 A.2d 1029, 1035 (1998) (reviewing the lower court's determination of custody); *Early v. Early,* 338 Md. 639, 654, 659 A.2d 1334, 1341 (1995) (reviewing the circuit court's child support order), not to be disturbed unless there has been a clear abuse of discretion, where the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are "legally correct" under a *de novo* standard of review. *See In re Mark M.,* 365 Md. 687, 782 A.2d 332 (2001) (reviewing a trial court's visitation order *de novo* when the issue involved whether the order itself constituted an improper delegation of judicial authority).

*Walter v. Gunter,* 367 Md. 386, 391–92, 788 A.2d 609 (2002).

### Discussion

█ DRD argues that the circuit court exceeded its statutory authority by ruling that the cohabitation of Shehan and Goddard voided the child support order. DRD acknowledged, however, during oral argument that it was not opposed to providing Shehan a set-off for the child support that he paid while he resided with Goddard in Connecticut.

Here, it would appear that Goddard was not informed of Shehan's motion to terminate the child support order, al-

though she and the child were directly affected by the decision of the circuit court.[4] She neither attended nor was represented by counsel at the hearings held by the master or the circuit court, and did not have the opportunity to testify before either the master or the circuit court. We believe that Goddard remains a party or has the right to participate as a party to any proceeding seeking to have an order of support declared void. Therefore, the circuit court violated FL § 5–1037, which provides: "The court may not enter an order under this subtitle against a party unless the party is given reasonable notice and an opportunity to be heard." In addition, but we need not decide, she may have been denied due process as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. Therefore, we shall vacate the decision of the circuit court and remand the case for further proceedings not inconsistent with this opinion. We provide the following for guidance on remand.

As expressed in FL § 5–1002:

(a) *In general.*—The General Assembly finds that:

(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

(2) the policies and procedures in this subtitle are socially necessary and desirable.

(b) *Purpose.*—The purpose of this subtitle is:

---

**4.** Counsel for Shehan certified that, on April 16, 2001, he mailed a copy of the Motion to Terminate Order of Child Support and Motion to Dismiss "to counsel for all parties." Goddard was a named party to the original paternity action (No. Paternity 3402869) and was designated as a party throughout the circuit court proceedings. She was designated as a co-plaintiff in the Notice of Appeal. As indicated above, counsel was aware of Goddard's whereabouts and had communicated with her shortly before filing the motion. Counsel for DRD introduced herself "for the record" as acting "on behalf of Domestic Relations." DRD identified itself in the record as acting on behalf of the State Child Support Enforcement Administration. We find no entry of appearance on behalf of Goddard after the original paternity petition, which was filed in the name "Vickie L. Goddard via Megan B. Johnson, Assistant State's Attorney for Anne Arundel County."

(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.

(c) *Establishment of paternity.*—Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child.

■ "[P]arenthood is both a biological and a legal status, that by nature and law it confers rights and imposes duties, and that one of the duties it casts upon parents is the duty to support their children until the law determines that the children are capable of self-support." *Thrower v. State ex rel. Bureau of Support Enforcement,* 358 Md. 146, 159, 747 A.2d 634 (2000) (citing *Carroll County Dep't of Soc. Servs. v. Edelmann,* 320 Md. 150, 577 A.2d 14 (1990)).

■ As Maryland courts have made clear, "[i]t is manifest that the Legislature intended the Paternity Act to occupy and control the field of disputed paternity." *State v. Rawlings,* 38 Md.App. 479, 482, 381 A.2d 708 (1978) (quoting *Quinan v. Schneider,* 247 Md. 310, 313, 231 A.2d 37 (1967)). The Act's purpose is achieved by following the statutory scheme in paternity cases and the resulting child support orders.

Upon a declaration of paternity, support is governed by FL § 5–1032, which provides:

(a) *In general.*—If the court finds that the alleged father is the father, the court shall pass an order that:

(1) declares the alleged father to be the father of the child; and

(2) provides for the support of the child.

**(b)** *Terminating events.*—**(1)** **The father shall pay the sum to be specified in the order until the first to occur of the following events:**

**(i) the child becomes an adult;**

**(ii) the child dies;**

**(iii) the child marries; or**

**(iv) the child becomes self-supporting.**

(2) If the child is an adult but is destitute and cannot be self-supporting because of a physical or mental infirmity, the court may require the father to continue to pay support during the period of the infirmity.

(c) *Continuation of child support.*—Any money that is due for child support under this subtitle and is unpaid at the time the child becomes an adult, dies, marries, or becomes self-supporting is a continuing obligation of any party bound by the order of court until the money is paid.

(d) *Garnishment of wages.*—The court shall pass an immediate and continuing withholding order on earnings of the father in accordance with Title 10, Subtitle 1, Part III of this article. [Emphasis added.]

In addition, FL § 5–1033(a)(1) provides that, in "a paternity proceeding, the court may order the father or the mother to pay all or part of . . . the support of the child."

With limited exceptions, "a declaration of paternity is final." FL § 5–1038(a)(1). The court, however, may modify or set aside certain provisions of a paternity order pursuant to FL § 5–1038, which provides, in pertinent part:

(a) *Declaration of paternity final; modifications.*—

\* \* \*

(2) (i) A declaration of paternity may be modified or set aside:

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—**Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.[5]** [Emphasis added.]

*See also Walter,* 367 Md. at 394–95, 788 A.2d 609; *Jessica G. v. Hector M.,* 337 Md. 388, 401, 653 A.2d 922 (1995); *Adams v. Mallory,* 308 Md. 453, 463, 520 A.2d 371 (1987). "Section 5–1038(b) deals strictly with paternity orders, i.e. orders relating to or arising from paternity declarations, or more specifically, orders relating to *valid and enforceable* paternity declarations." *Walter,* 367 Md. at 395, 788 A.2d 609 (emphasis in original).

The existing statutory scheme concerning paternity proceedings does not expressly provide a basis for termination of child support when the unmarried parents live together. The cases relied on by the circuit court, *Thomas v. Thomas,* 294 Md. 605, 451 A.2d 1215 (1982), and *Torboli v. Torboli,* 365 Md. 52, 775 A.2d 1207 (2001), are distinguishable from this case. The parties in those cases were married; Shehan and Goddard were not. In *Torboli,* the order for emergency family maintenance expressly forbade the parties' cohabitation; the paternity order in this case contained no such prohibition. In addition, FL § 5–1032(b) provides that child support may only be

---

**5.** We note that the termination and modification provisions outlined in FL §§ 5–1032(b)(1) and 5–1038(b) do not expressly prohibit a court from modifying a child support order to a date prior to the filing of a motion for modification or require "a showing of a material change of circumstance." FL § 12–104(a).

terminated upon the child becoming an adult, the death or marriage of the child, or if the child becomes self-supporting.

We have not been directed to, nor have we found, a Maryland paternity case that has considered the effect of cohabitation on a support order. Some guidance is provided in cases from other states.

In *Griffis v. Griffis*, 202 W.Va. 203, 503 S.E.2d 516 (1998), two identical questions were certified to the court by the Circuit Court of Boone County in three separate cases. In one case, in which no paternity action was filed, but a subsequent divorce order found that Mr. Griffis was the child's father, the court concluded that the "marriage or remarriage of parents automatically terminates the preexisting child support order; however, mere cohabitation does not." *Id.* at 205, 503 S.E.2d 516. The court stated that the "substantial differences that exist between marriage and cohabitation unquestionably compel the conclusion that cohabitation, without marriage, is insufficient to automatically nullify the provisions of an existing court order related to child custody and support." *Id.* at 211, 503 S.E.2d 516.

We have found other cases that have considered the issue of cohabitation and the presumption that is created when a parent, who owes child support, cohabitates with and becomes the co-custodial parent of his or her children. None of these cases, however, are paternity cases.

In *Patron v. Patron*, 40 Va. Cir. 379 (1996), the circuit court concluded that parents who were involved in a divorce proceeding, but who had been living together, were both "custodians and there [was] no showing that the child's needs [were] not being met while living with her parents, all in the same household." *Id.* at 380 Accordingly, the court denied the wife's request for child support. *Id.*

In *Parker v. Parker*, 86 Ohio App.3d 727, 621 N.E.2d 1229 (Ohio Ct.App.1993), the court considered the effect on child support of divorced parties that continued to live together. The court held that Mr. Parker was entitled to a "credit for

unpaid support" during the period that he cohabitated with his former wife and their child. *Id.* at 730, 621 N.E.2d 1229.

In *Dalton v. Dalton,* 207 W.Va. 551, 560, 534 S.E.2d 747 (2000), the parties were married, had a child, and divorced. The Husband was ordered by the court to pay $225 per month in child support. The parties, however, continued to reside together for approximately eight years. In considering whether the husband met his child support obligation, the court found that cohabitation did not create a "presumption that the obligor has fulfilled his or her support obligations." Rather, the parties' cohabitation is but one factor in determining whether the obligor former spouse met his or her support obligations. *Id.* at 560, 534 S.E.2d 747. The court also stated that the "obligor bears the burden of proving that he or she has made court-ordered support payments." *Id.*

Here, the child remains a minor and the circumstance of cohabitation ended no later that 1998. Considering that the purpose of the applicable law is to secure support for children born out of wedlock and to impose on the parents of such children the responsibilities of parenthood, it is difficult to understand how declaring the outstanding orders of support void could be just and proper and in the child's best interest. Therefore, we conclude that a period of cohabitation by the father with the child's mother and child does not void support orders issued pursuant to FL §§ 5–1032(a)(2).

█ Nevertheless, and in keeping with FL § 12–204(k)(2), which provides that the "the custodial parent shall be presumed to spend that parent's total child support obligation directly on the child or children," it is to be presumed, absent evidence to the contrary, that Shehan spent his child support obligation on the child during the periods that the parties actually cohabitated. The circuit court, based on the evidence presented by the parties, must determine the period of time that the couple and the child lived together in Connecticut in order to establish the amount of any support credits to which appellant may be entitled.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.