856 A.2d 679

**Brett EVANS**

v.

**Trina WILSON.**

No. 123, Sept.Term, 2003.

Court of Appeals of Maryland.

Aug. 24, 2004.

Bonnie J. Butler (Thomas McKeon, Butler, McKeon & Associates, P.A., Baltimore, on brief), for appellant.

Frederick L. Kobb (Joy K. Sakellaris, Wright, Constable & Skeen, LLP, Baltimore, on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

Brett Evans appeals the judgment of the Circuit Court for Baltimore City, dismissing his complaints for orders of visitation and to determine paternity of Kendi Ateah Ja'Far, the daughter of Trina Wilson. Evans claims to be the biological father of Kendi, who was conceived and born while Wilson was married to another man, Askahie Harris. The Circuit Court ruled that Evans had not overcome the statutorily imposed presumption that Kendi was the legitimate child of Wilson and Harris and that ordering Kendi to undergo genetic testing was not in the child's best interests. We agree with the Circuit Court's conclusion and, for the reasons discussed herein, shall affirm.

## I. Background

### A. Facts

Evans first met Wilson in 1997 when he began working for Wilson's employer, the Baltimore Prevention Coalition. Evans started dating Wilson after he had worked at the Coalition for approximately two months. During the relationship, Wilson became pregnant and later terminated the pregnancy. Evans and Wilson broke up sometime between 1998 and 1999.

After her break-up with Evans, in the fall of 1999, Wilson was introduced to Harris. Soon thereafter, the two began a serious dating relationship that led to an eventual marriage proposal by Harris. On October 7, 2000, Wilson and Harris participated in a Muslim wedding ceremony performed by James Muhammed, a Muslim minister. Although Wilson and Harris had not acquired a Maryland marriage license before the ceremony, they entered into a "marriage contract." Under the contract, Wilson and Harris agreed to various terms governing their marriage relationship, including that they would have at least one child and that the child would be raised Muslim. Wilson and Harris lived together after the

wedding in Wilson's mother's house pursuant to a lease agreement that they had signed in October of 2000.

When Wilson and Harris were experiencing problems in their new marriage during the winter of 2000 and 2001, Wilson had a chance encounter with Evans. Several weeks later, in February or March of 2001, Wilson visited Evans' apartment and had sexual intercourse with him. Wilson stated that this was the only time she had intercourse with Evans while married to Harris. Evans testified, however, that he and Wilson had sexual intercourse on more than one occasion, the last occurring in April of 2002.

Wilson continued to live with Harris while seeing Evans. In fact, around the time of Wilson's affair with Evans, Wilson and Harris began trying to conceive a baby. Then, in May of 2001, Wilson learned that she was pregnant. She estimated that, based on her monthly cycle, the date of conception was approximately April 22, 2001.

Wilson and Harris testified that, during and after the pregnancy, they believed that Harris was the father. Wilson stated that Harris assisted her during the pregnancy by staying home with her during the day because she was nauseous, by shopping with her for the baby, and by helping to arrange the nursery. Although Harris did not attend Wilson's baby shower in November of 2001 because he thought it was "a girl thing," his friends, believing that Harris was the father, organized a party for him to celebrate the imminent birth.

Evans testified, however, that, during Wilson's pregnancy, he was led to believe that he was the father of Wilson's child. According to Evans, Wilson told him that she was pregnant with his child. Evans stated that he spent numerous nights at Wilson's home after learning of the pregnancy and that he helped Wilson prepare for the birth by painting and setting up the baby's room. Evans stated that, even though he spent nights at Wilson's home, he did not realize that she was married during the pregnancy. He testified that he bought

baby clothes and attended a baby shower for Wilson in November of 2001.

Wilson gave birth to Kendi on January 19, 2002. On that day, Harris was in Virginia on business, so he could not attend the birth even though he had planned to do so. While at the hospital following the birth, Wilson was approached about completing a birth certificate for Kendi. She was told that, because she was the only parent present, she could only fill out her portion of the application, and the father, at some later time, would have to complete an affidavit of parentage to be named as the father on Kendi's birth certificate. When Harris returned from his trip, he took Wilson and Kendi home from the hospital. Harris did not complete the affidavit of parentage at the hospital because he was in a rush to take Wilson and Kendi home and was not aware of the birth certificate procedures. Several months later, on November 28, 2002, Harris completed the affidavit of parentage; Kendi's birth certificate, issued subsequently, names Harris as the father. According to Wilson, several weeks after arriving home, she prepared and mailed birth announcements that identified Harris as Kendi's father.

Evans was also out of town on January 19 and did not attend Kendi's birth; however, Wilson called Evans' parents, who visited Kendi in the hospital that day. Evans testified that he visited Kendi three days after Wilson arrived home from the hospital.

Evans claimed that, after the birth, Wilson continued to suggest to Evans that he was Kendi's father. For instance, Evans received a card from Wilson congratulating him and wishing him, "Happy Parenting." The card stated: "When we met . . . 1 never would have thought that we would have created a life together. Now here we are more than 5 yrs. later the parents of a beautiful baby girl." Wilson, while at the hospital, also prepared a birth announcement that identified Evans as the father of Kendi, but, according to Wilson, never sent them to family and friends. When Kendi was nearly one month old, Wilson sent Evans a Valentine's Day

card that stated, "Happy Valentine's Day, Daddy," and "For you Daddy from your sunshine." A birthday card later sent to Evans from Wilson showed pictures of Kendi and said: "It's Kendi Brina Ja'Far, my daddy and me. I love you. Happy Birthday Daddy." Both the Valentine's Day and birthday cards referred to Kendi by using the name "Brina," a hybrid of Evans' and Wilson's first names.

According to Wilson, all of this written correspondence with Evans after Kendi's birth was part of a "sick game" that she had devised because of the guilt she felt over terminating the pregnancy when she and Evans were dating. Wilson stated that she and Evans "played out" this game to address some of the "unresolved issues" that lingered after their break-up. Wilson said that she had used the name "Brina" in the cards because that was the name that she and Evans had created during her first pregnancy. She also testified that Evans knew she was pretending whenever she suggested that he was Kendi's father.

Evans has not seen Kendi since she was six weeks old. During the first few weeks of Kendi's life, Evans visited Kendi several times at Wilson's home. Evans' mother and father also have visited Kendi on a number of occasions. Evans has not provided child support to Kendi other than purchasing approximately $80 worth of baby supplies throughout 2002.

Harris, on the other hand, is the only man that Kendi has known as a father. She calls him "Daddy," and he participates in many of the routine tasks involved in parenting, such as caring for Kendi when she is sick and helping pay for her daycare, food, and clothes. Harris testified that he spends time with her every day after work, takes her to the movies occasionally, and watches television with her. He, Wilson, and Kendi eat together and, on weekends, they play games and visit the park or zoo. Harris believes that Kendi is attached to him because, when he has to leave her, she often becomes very upset and cries.

## B. Procedural History

On December 2, 2002, Evans filed in the Circuit Court for Baltimore City a Complaint for Order of Visitation in which he alleged that he was Kendi's father and requested a specific schedule of visitation. Wilson answered the Complaint on January 24, 2003 and denied that Evans was Kendi's father. Then, on June 23, 2003, Evans filed a Complaint to Determine Paternity, alleging that he had engaged in a sexual relationship with Wilson that lasted until March 2001 and that Wilson had become pregnant in that month. Evans also requested that the court order the parties and Kendi to submit to blood or genetic testing for the purpose of establishing Kendi's paternity. Wilson filed an answer to Evans' complaint and again denied that Evans was Kendi's father. She further claimed that, instead, Kendi was the child of Harris to whom Wilson was married "at the time of the Child's conception and birth."

On August 15, 2003, Judge Marcella A. Holland held a hearing to consider whether to order paternity testing or visitation. After hearing the testimony of various witnesses, including Evans, Wilson, and Harris, Judge Holland rejected Evans' claims. She reasoned that, because Kendi was born while her mother was married to Harris, she is presumed by law to be the married couple's child. Therefore, in Judge Holland's view, to succeed on his claim, Evans had to overcome that presumption and demonstrate that a paternity test would be in the best interests of the child. She determined that Evans failed to overcome the presumption because he had not presented sufficient evidence of a "strong bond between him and the child." Judge Holland stated that there may be a suspicion that Evans is Kendi's father, but she refused to "destroy a family unit based on suspicion." In the Judge's view, the degree to which Evans cast suspicion on Kendi's parentage did not justify ordering genetic testing that would "dismantle" an intact family unit and not serve Kendi's best interests. Accordingly, Judge Holland issued an order on August 19, 2003 dismissing Evans' complaints. On September

26, 2003, Judge Holland dismissed Evans' post judgment motion for reconsideration.

Evans filed a timely appeal to the Court of Special Appeals, but before any proceedings in that court, we issued a writ of certiorari on our own initiative. *Evans v. Wilson*, 379 Md. 225, 841 A.2d 339 (2004). Evans presents the following questions for our review:

1. Did the trial court err in applying a "best interests" analysis when considering Mr. Evans' request to establish paternity of a child born after the marriage of Ms. Wilson and her husband?

2. Did the trial court err by not automatically permitting a blood or genetic test upon the request of Mr. Evans, the "putative father?"

3. Assuming that the best interest[s] standard still applies to a putative father's request for a blood test of a child born during a marriage, did the trial court err in its application of that standard?

4. Did the trial court violate Mr. Evans' constitutionally protected liberty interest and deny him due process of law when it dismissed his complaint to establish paternity?

We hold that the trial court committed no error in denying Evans' request for a mandatory paternity test of Kendi, nor did it violate any constitutionally protected liberty interest enjoyed by Evans. Under Maryland law, Kendi is the presumed child of Wilson and Harris, who were married at the time of her birth. The Circuit Court correctly considered Kendi's best interests before denying paternity testing and, in so doing, did not abuse its discretion. Furthermore, we conclude that Evans has no constitutionally protected interest in having a relationship with the child of Wilson and Harris; consequently, no violation of due process occurred when the Circuit Court rejected his petition for a paternity test.

## II. Standard of Review

 Our review of the Circuit Court's order in this case centers on whether the order was legally correct. *Walter v. Gunter,* 367 Md. 386, 391–92, 788 A.2d 609, 612 (2002). If the order being reviewed involves an interpretation or application of Maryland statutory or case law, our review is *de novo. Id.* at 392, 788 A.2d at 612. If, on the other hand, the trial judge correctly interpreted and applied the law and the matter falls within the sound discretion of the trial court, we ordinarily defer to the trial court's judgment, recognizing that "it is in the best position to assess the import of the particular facts of the case and to observe the demeanor and credibility of witnesses." *Beckman v. Boggs,* 337 Md. 688, 703, 655 A.2d 901, 908 (1995) (citing *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016, 1023 (1994)). Questions regarding the best interests of a child fall generally within the sound discretion of the trial court and ordinarily will not be disturbed absent a clear abuse of discretion. *See Walter,* 367 Md. at 391–92, 788 A.2d at 612; *Giffin v. Crane,* 351 Md. 133, 144–45, 716 A.2d 1029, 1035 (1998); *Beckman,* 337 Md. at 703, 655 A.2d at 909; *Voishan v. Palma,* 327 Md. 318, 331, 609 A.2d 319, 326 (1992).

## III. Discussion

Evans contends that the Circuit Court erred in applying the best interests of the child standard in determining that Kendi ought not have a blood test to establish conclusively her paternity. He submits that, rather, the court should have mandated a paternity test of Kendi and himself and then, after learning the results, considered the best interests of Kendi in determining issues of visitation. Evans argues in the alternative that, even if the "best interests" standard controls the decision of whether to order a paternity test in this case, the Circuit Court "erred in its application of that standard" because it failed to balance Evans' interest in establishing himself as a father against Wilson's interest in preserving her intact family. Evans' final argument is that he has a "constitutionally protected liberty interest in the opportunity to develop a relationship" with Kendi and that the Circuit Court deprived him of that opportunity without due process of law.

Wilson advances the position that, under the holding in *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992), the Circuit Court was correct to use the "best interests" standard in determining whether Kendi, who was born during a marriage and is presumed to be the legitimate child of Wilson and Harris, should be required to submit to blood or genetic testing. Wilson further maintains that the Circuit Court properly exercised its discretion when denying Evans' request for a paternity test. Wilson agrees with the Circuit Court's assessment that ordering a paternity test in this case would be contrary to Kendi's best interests because the test would "risk breaking apart a stable and supportive family." As to Evans' "due process" claim, Wilson argues that no constitutional liberty interest is at stake and, therefore, Evans has no entitlement to due process with respect to obtaining Kendi's paternity test.

### A. The "Best Interests" Standard Applies

 To resolve the present controversy, we first must determine whether the trial judge was correct in concluding that the decision of whether to order a paternity test in this case depended on an evaluation of the best interests of the child. Two sets of provisions under the Maryland Code relate to paternity determinations. One method for ascertaining paternity can be found in Maryland Code, Section 1–206 and 1–208 of the Estates and Trusts Article (1974, 2001 Repl.Vol.). Section 1–206(a), for testamentary purposes, creates a presumption of "legitimacy" for children born to a married mother:

(a) *Marriage of parents.*—A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in § 1–207, a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.[1]

---

1. Apparently suggesting that the statutory presumption should not apply in this case, Evans mentions that, when Wilson and Harris were

Maryland Code, § 1–206(a) of the Estates and Trusts Article (1974, 2001 Repl.Vol.).[2] Under this provision, the husband is the presumed father of the child born to his wife during the marriage.

On the other hand, when a child is born to parents who have not participated in a marriage ceremony with each other, Section 1–208 of the Estates and Trusts Article establishes the rules for determining the child's mother and father:

(a) *Child of his mother.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother.

(b) *Child of his father.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:

(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;

(2) Has acknowledged himself, in writing, to be the father;

---

married, they had not obtained a marriage license. We note, however, that the statutory presumption is not dependent on whether the man and woman procured a marriage license. All that is necessary for the presumption to apply is that the husband and wife have "participated in a marriage ceremony with each other." It cannot be denied that this requirement has been established in this case, given the uncontradicted testimony that Wilson and Harris participated in a Muslim marriage ceremony on October 7, 2000.

2. Section 1–207 of the Estates and Trusts Article, which is referenced in Section 1–206, involves adopted children and is not relevant for the purpose of the present discussion. It states:

(a) *General Rule.*—An adopted child shall be treated as a natural child of his adopting parent or parents. On adoption, a child no longer shall be considered a child of either natural parent, except that upon adoption by the spouse of a natural parent, the child shall be considered the child of that natural parent.

(b) *More than one adoption.*—A child who has been adopted more than once shall be considered to be a child of the parent or parents who have adopted him most recently and shall cease to be considered a child of his previous parents.

(3) Has openly and notoriously recognized the child to be his child; or

(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

Code, § 1–208 of the Estates and Trusts Article.

■ Other statutory provisions governing "Paternity Proceedings" are located in Maryland Code, Sections 5–1001 through 5–1048 of the Family Law Article (1984, 2001 Repl. Vol.). Section 5–1002(b) sets forth the purpose of those sections, which collectively are subtitled, "Paternity Proceedings" (hereinafter the "Paternity Act"):

The purpose of this subtitle is:

(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.

Code, § 5–1002(b) of the Family Law Article. Section 5–1029 establishes the availability of blood or genetic testing of the parties to a paternity proceeding under the Paternity Act. It states in relevant part:

On the motion of the [Child Support Enforcement Administration], a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

Code, § 5–1029(b) of the Family Law Article. Under this provision, a trial court has no discretion over whether to order a blood or genetic test. *See Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000). Instead, upon any party's motion, the

presiding court "shall order the mother, child, and alleged father" to undergo paternity testing.

This Court, in *Turner v. Whisted*, 327 Md. 106, 607 A.2d 935 (1992), had the opportunity to consider whether the determination of paternity should be governed by the Estates and Trusts Article or the Paternity Act when the child in question was born during a marriage, and we concluded that an equitable action under the Estates and Trusts Article was the best way of establishing paternity in such a case. *Id.* at 113, 607 A.2d at 938. Turner had a sexual relationship with an unmarried woman who became pregnant. *Id.* at 109, 607 A.2d at 936. Before the child was born, however, the woman married another man and delivered the child during that marriage. *Id.*, 607 A.2d at 936. Six months after the birth, the child's mother and her husband separated. *Id.*, 607 A.2d at 937. While separated from his wife, the husband continued to visit the child on a regular basis and paid support for the child's care. After leaving her husband, the child's mother again started seeing Turner, who was then able to develop a relationship with the child. *Id.* Eighteen months after renewing their relationship, Turner and the child's mother broke up, and Turner's contact with the child came to an end. *Id.*

Turner sued, seeking visitation and an order for a blood test of the child to determine his paternity. *Id.* Following decisions in the Circuit Court and Court of Special Appeals denying Turner's requests, this Court issued a writ of certiorari to determine whether Section 5–1029 of the Family Law Article, the statute mandating that a child submit to a blood test, was appropriate for situations like Turner's. *Id.* at 111, 607 A.2d at 937. We rejected the proposition that the case necessarily was controlled by the provisions of Section 5–1029. *Id.* at 112, 607 A.2d at 938. Instead, we declared that paternity actions may be pursued under either the provisions of the Family Law Article *or* in equity under the Estates and Trusts Article. *Id.*

Nevertheless, we concluded that "an action to establish paternity is more appropriately brought under the Estates &

Trusts Article" when the child at issue has been born during a marriage. *Id.* at 113, 607 A.2d at 938. As we explained, where a child is presumed "legitimate" and "where two men each acknowledge paternity" of that child, the procedure for considering the issue of paternity under the Estates and Trusts Article is preferable because it presents the "more satisfactory" and "less traumatic" means of establishing paternity. 327 Md. at 113, 607 A.2d at 938 (citing *Thomas v. Solis,* 263 Md. 536, 544, 283 A.2d 777, 781 (1971); *Dawson v. Eversberg,* 257 Md. 308, 314, 262 A.2d 729, 732 (1970)). We compared a motion for a blood test under the Estates and Trusts Article with a request for a physical examination under Maryland Rule 2–423,[3] which the court has discretion to grant for good cause. *Id.* at 113–14, 607 A.2d at 939. In our view, the discretionary aspect of the court's decision under the Estates and Trusts Article permits consideration of the competing interests at issue. *Id.* at 114, 607 A.2d at 939. For example, the court "must" consider the husband and wife's privacy interest along with the petitioner's interest in a relationship with the child. *Id.* "Most significantly" though, we recognized that, in applying its discretion, the court may consider "the best interests of the child." *Id.* at 116, 607 A.2d at 940. We explained further:

> The criteria for determining the child's best interests in cases of disputed paternity include consideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical,

---

3. Maryland Rule 2–423 states:

When the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a suitably licensed or certified examiner or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause and upon notice to the person to be examined and to all parties. It shall specify the time and place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. The order may regulate the filing and distribution of a report of findings and conclusions and the testimony at trial by the examiner, the payment of expenses, and any other relevant matters.

mental, and emotional needs. An important consideration is the child's past relationship with the putative father. Finally, other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.

*Id.* at 116–17, 607 A.2d at 940.

In the present case, like in *Turner*, two men (one the mother's husband and the other her one time paramour) claim to be the father of a child born during a marriage so that, as we made clear in *Turner*, the provisions of the Estates and Trusts Article set forth the appropriate procedures for analyzing the question of a child's paternity in such a case. The application of those provisions to this case is straightforward. Under Section 1–206, Kendi is the presumed child of Wilson and Harris, and a blood or genetic test may be ordered only upon a showing of good cause presumably of sufficient persuasive force to overcome the statutory presumption. When making the determination of good cause, the court must weigh the various interests of the parties and, in particular, consider whether blood or genetic testing would be in the best interests of Kendi. The Circuit Court, therefore, correctly followed the precedent in *Turner* and made the decision to deny Kendi's blood or genetic test based on an assessment of the child's best interests.

Evans argues, however, that *Turner* has lost some of its authoritative value in light of several amendments to the Family Law Article and our more recent opinion in *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000). He alleges that these developments in the law represent an expansion of "the rights of putative fathers" to the extent that a "putative father has an absolute right to demand blood or genetic testing [of the child] at any time." Although Evans is correct that "putative fathers" now have greater rights to challenge paternity declarations, the expanded rights to which he refers do not apply to individuals in his position. That is, as we explain in greater detail below, because Kendi was not born out of wedlock, Evans is not her "putative father."

It is true that since the *Turner* decision, the General Assembly and this Court have changed the legal landscape of "Paternity Proceedings" governed by the Family Law Article. The transformation began in 1994 when we filed our decision in *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994), where we held that, under Maryland Rule 2–535,[4] a trial judge could set aside or otherwise alter or amend a judgment of paternity after 30 days only in the event of "fraud, mistake, . . . irregularity," or clerical error. *Id.* at 315, 648 A.2d at 445. As a consequence of the holding, two men, who had been named as fathers in two separate paternity judgments and who had not established fraud, mistake, irregularity, or clerical error, were required to continue paying child support, despite strong evidence that they were not the biological fathers. *Id.* at 323, 648 A.2d at 448.

The year after the *Tandra S.* decision, the General Assembly amended Section 5–1038 of the Family Law Article, to provide an alternative way for an adjudged father to challenge a judgment of paternity. *See* 1995 Maryland Laws, ch. 248. The amended language of Section 5–1038(a)(2)(i)(2) permits a paternity judgment to be set aside at any time if blood or

---

4. Maryland Rule 2–535 provides:

(a) Generally. On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take action that it could have taken under Rule 5–534.

(b) Fraud, mistake, irregularity. On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

(c) Newly-discovered evidence. On motion of any party filed within 30 days after entry of judgment, the court may grant a new trial on the ground of newly-discovered evidence that could not have been discovered by due diligence in time to move for a new trial pursuant to Maryland Rule 2–533.

(d) Clerical mistakes. Clerical mistakes in judgments, orders, or other parts of the record may be corrected by the court at any time on its own initiative, or on motion of any party after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed by the appellate court, and thereafter with leave of the appellate court.

genetic testing establishes that the named father is not the biological father of the child. Section 5–1038 now provides:

(a) *Declaration of paternity final; modifications.*—(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) A declaration of paternity may be modified or set aside:

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

Code, § 5–1038 of the Family Law Article.

In *Langston,* we had occasion to interpret two aspects of Section 5–1038 as it was amended in 1995. 359 Md. at 403, 754 A.2d at 392. We consolidated three separate cases in which individuals had unsuccessfully sought blood or genetic testing to overturn paternity judgments. Each judgment had been entered before the 1995 amendment to the statute. *Id.* at 399, 754 A.2d at 390. We held that the amended statute applied retrospectively to paternity judgments issued before the law's effective date on October 1, 1995. *Id.* at 417–18, 754 A.2d at 400. Thus, the men who had been declared fathers by the court before that date could move, pursuant to Section 5–1029, to reopen paternity proceedings for blood or genetic testing. *Id.* at 437, 754 A.2d at 411.

We further held in *Langston* that the availability of blood or genetic testing under Section 5–1029 did not depend on any analysis of "the best interests of the child" because, when an individual challenges a declaration of paternity in which he is named the father and then moves for a blood or genetic test, the trial court *must* grant the request. *Id.* at 435, 754 A.2d at 410. We summarized this holding as follows:

> In ... proceedings [pursuant section 5–1038(a)(2)(i)2 of the Family Law Article], the putative father may, by motion, request a blood or genetic test, pursuant to section 5–1029, in order to confirm or deny paternity, which is admissible in evidence under the provisions of that statute. A determination of the best interests of the child in ordering the requested testing, or in the consideration of paternity, whether original or revised, is inappropriate.
>
> Our holding today applies only to proceedings to modify or set aside a paternity declaration; an attempt to modify or set aside any other order resulting from an original paternity declaration is governed by 5–1038(b).

*Id.* at 437, 754 A.2d at 411.[5]

In 1997, the General Assembly again amended the "Paternity Proceedings" subtitle of the Family Law Article, adding Section 5–1002(c), which states: "Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child." Maryland Code, § 5–1002(c) of the Family Law Article (1984, 1999 Repl.

---

5. Evans also cites *Walter v. Gunter*, 367 Md. 386, 788 A.2d 609 (2002) to support his argument that the rights of "putative fathers" have been expanded recently. *Walter*, however, is not applicable to the present discussion of the application of the "best interests" standard. Rather, in *Walter*, we explored the effect of a vacated paternity judgment on the named father's child support arrearages. *Id.* at 392, 788 A.2d at 612. The Circuit Court in that case had vacated a paternity judgment and prospectively terminated the related child support order, but the court did not excuse the past child support obligations for which the named father was in arrears. *Id.* This Court held that the trial court erred because, "upon vacating a paternity declaration, the putative father cannot be legally obligated for arrearages emanating from child support orders resulting from the now-vacated paternity declaration." *Id.* at 403, 788 A.2d at 619.

Vol). The Legislature added this language to Section 5–1002 for the purpose of "clarifying that a putative father may file a paternity action." 1997 Maryland Laws, ch. 609.

The coalescence of *Langston* and the 1995 and 1997 amendments to the "Paternity Proceedings" of the Family Law Article brings into question whether our holding in *Turner* has been invalidated so that the mandatory blood or genetic testing of Section 5–1029 is now available to challenge the paternity of a child born during an intact marriage.

The Court of Special Appeals recently addressed this issue in *Stubbs v. Colandrea,* 154 Md.App. 673, 841 A.2d 361 (2004). In that case, like in the case before us, a man alleged that he was the father of a child conceived and born during the marriage of the child's mother to a different man. *Id.* at 675, 841 A.2d at 362. The court faced the question of whether, upon the petitioner's motion, a blood or genetic test of the child was mandatory under Section 5–1029(b). *Id.* at 680, 841 A.2d at 365. Judge Rodowsky, writing for the court, first explored the effect of Section 5–1002(c), which prohibits any construction of the statute that would limit the right of a "putative father" to file an action to "establish paternity of a child." *Id.* (citing Maryland Code, § 5–1002(c) of the Family Law Article 1984, 1999 Repl.Vol.). As Judge Rodowsky explained, a "putative father" is one who has fathered a child "out of wedlock":

> Although "putative father" is not a defined term in the Paternity Act, the quoted term has a settled legal meaning. Black's Law Dictionary defines "putative father" to mean "[t]he alleged biological father of a child born out of wedlock." Black's Law Dictionary 623 (7th ed.1999).
>
> That the dictionary meaning of "putative father" was intended by the General Assembly when using that term in [Section 5–1002(c)] is confirmed by construing subsection (c) compatibly with the balance of [Section 5–1002] to which subsection (c) was added.

*Id.* at 683–84, 841 A.2d at 367. As support for the dictionary definition of "putative father" Judge Rodowsky quoted Section

5–1002(b), which states that one of the purposes of the paternity act is to "promote the general welfare and best interests of children born *out of wedlock*." *Id.* at 684, 841 A.2d at 367 (citing Maryland Code, § 5–1002(b) of the Family Law Article (1984, 1999 Repl.Vol.)) (emphasis added). The Court of Special Appeals thus concluded that the " 'child' in [Section 5–1002(c)] refers to a child born out of wedlock." *Id.* As further support for the court's reading of the term "putative father," Judge Rodowsky extensively reviewed the legislative history of Section 5–1002(c), focusing specifically on the federal legislation that precipitated its enactment. *Id.* at 684, 841 A.2d at 367.[6] The court held:

---

6. Judge Rodowsky for the court in *Stubbs* observed that Section 5–1002(c) was introduced in the General Assembly as Senate Bill 636, the state legislature's response to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Federal Act"). *Id.* at 684, 841 A.2d at 367. He noted that the Federal Act, in an attempt to combat the increase in "out-of wedlock pregnancies," conditioned the receipt of continued federal assistance on certain federal standards. *Id.* at 686, 841 A.2d at 368. Senate Bill 636, according to Judge Rodowsky, was then recommended in an effort to comply with these standards as well as 42 U.S.C. § 666(a)(5), which declares that "each State must have in effect laws requiring the use of [certain] procedures ... to increase the effectiveness of the [child support enforcement] program." *Id.* at 687, 841 A.2d at 369 (quoting 42 U.S.C. § 666(a)). One such procedure concerned the establishment of paternity by "genetic testing":
> (i) Genetic testing required in certain contested cases. Procedures under which the State is required, in a contested paternity case (unless otherwise barred by State law) to require the child and all other parties ... to submit to genetic tests upon the request of any such party, if the request is supported by a sworn statement by the party—
> (I) alleging paternity, and setting forth facts establishing a reasonable possibility of the requisite sexual contact between the parties; or
> (II) denying paternity, and setting forth facts establishing a reasonable possibility of the nonexistence of sexual contact between the parties.
> *Id.* at 687, 841 A.2d at 369 (quoting 42 U.S.C. § 666(a)(5)(B)). Judge Rodowsky also quoted a Conference Report on the Federal Act, which stated that the Act " 'contained a number of new provisions that have no direct parallel in current law.' " *Id.* (citing H. Rep. No. 104–725 (1996)). The Conference Report described one such unique provision as follows: "Standing of Putative Fathers. Putative fathers must have a reasonable opportunity to initiate a paternity action." *Id.* (quoting H. Rep. No. 104–725 (1996)). Based on this discussion, the Court of

Nothing in the text of [Section 5–1002(c)], or in its Maryland or federal legislative histories, indicates that the General Assembly intended to alter the *Turner v. Whisted* test for determining whether a blood test should be ordered under the circumstances presented here, or that the Federal Government intended to require, under the circumstances presented here, a mandatory blood test similar to that provided by [Section 5–1029].

*Id.* at 688, 841 A.2d at 369–70.

The *Stubbs* court also distinguished our opinion in *Langston* on the ground that it, like Section 5–1002(c), dealt with children born out of wedlock. *Id.* at 689, 841 A.2d at 370. Judge Rodowsky also stated that *Langston* was inapplicable because it concerned a putative father seeking to disavow his child support obligation rather than an individual requesting to establish paternity by a blood test. *Id.* Consequently, following *Turner*, the Court of Special appeals held that "a request to establish paternity by a blood test ... is to be evaluated under [Section 1–208 of the Estates and Trusts Article]." *Id.*

Judge Rodowsky's persuasive analysis leads us, as well, to conclude that the General Assembly intended the language of Section 5–1002(c) to ensure the protection and support of children *born out of wedlock.* Therefore, we agree with the Court of Special Appeals that the effect of Section 5–1002(c) does not reach the situation before us, where Evans seeks to establish paternity of a child born during a marriage.

We also agree with the *Stubbs* court that *Langston* does not affect our holding in *Turner.* As the Court of Special Appeals observed, *Langston* involved cases where the men who had been declared fathers in paternity judgments sought to *exclude* themselves as the biological fathers of children born out

---

Special Appeals determined that, when read in context, the federal impetus for Section 5–1002(c) was aimed at providing "fathers of children born out of wedlock" an avenue for establishing their paternity for the purpose of "honor[ing] their support obligations." *Id.* at 688, 841 A.2d at 369.

of wedlock. By contrast, in the present case and in *Turner,* the children were born in wedlock and the petitioning men sought, contrary to the presumption of marital legitimacy, to *establish* paternity in hopes of obtaining visitation rights.

Moreover, considering the "best interests" standard represents the best policy for evaluating when a child born during a marriage can be ordered to undergo paternity testing. If the mandatory blood or genetic testing under Section 5–1029 could be invoked every time an individual seeks to establish paternity of a child born during a marriage, the consequences to intact families could be devastating. Without regard to the child's best interests, courts would be forced to order genetic tests of every child whose paternity is merely questioned. This would be the case even if the child is well cared for and could assert that he or she does not want his or her life to be disturbed. We do not believe that, in enacting the "Paternity Proceedings" of the Family Law Article, the legislature intended such an effect.

*Turner,* therefore, remains the controlling precedent for cases such as this, where two men (one the husband of the mother and the other a stranger to the marriage) acknowledge the paternity of a child born during a marriage. We hold that the trial judge was correct to conclude that the best interests of the child governs whether to order blood or genetic testing of Kendi.

## B. Abuse of Discretion

■ Having determined that the "best interests of the child" standard applies in this case, we turn to Evans' alternative argument that the trial judge erred in her application of that standard. Evans contends that a blood or genetic test would not jeopardize Kendi's interests in preserving the family unit because, in Evans' view, Wilson and Harris did not have an intact family. Furthermore, Evans suggests that the trial court placed too much emphasis on the possible consequences of the results of the paternity test and did not adequately weigh Evans' interest in establishing himself as the father of Kendi. These arguments are unavailing.

■ Absent a clear abuse of discretion, an appellate court ordinarily will not disturb a trial court's assessment of the best interests of a child. *See Walter,* 367 Md. at 391–92, 788 A.2d at 612; *Giffin,* 351 Md. at 144–45, 716 A.2d at 1035; *Beckman,* 337 Md. at 703, 655 A.2d at 909; *Voishan,* 327 Md. at 331, 609 A.2d at 326. In *Turner,* we offered the following guidance for applying the "best interests" standard, which we stated should be the trial court's "paramount concern":

> The criteria for determining the child's best interests in cases of disputed paternity include consideration of the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs. An important consideration is the child's past relationship with the putative father. Finally other factors might even include the child's ability to ascertain genetic information for the purpose of medical treatment and genealogical history.

327 Md. at 116–17, 607 A.2d at 940. In addition to these criteria, we stated that the trial judge should "consider the extent of [the paramour's] commitment to the responsibilities of parenthood, and balance his interest in establishing his status as [the child's] natural father against the [married couple's] interest in protecting the integrity of the familial relationships already formed." *Id.* at 117, 607 A.2d at 940.

The trial judge in the present case followed this guidance. In rendering her decision, Judge Holland emphasized that her primary concerns were Kendi's best interests. Invoking *Turner,* she recognized that preserving the family unit was "crucial" to Kendi's interests and that it outweighed Evans' interest in establishing his status as Kendi's father. Judge Holland acknowledged that Evans' relationship with Wilson created some "suspicion" that he was the father. The judge refused, however, to "destroy a family unit based on suspicion," especially given what was, in the judge's estimation, an insufficient connection between Evans and Kendi.

The trial judge's analysis here demonstrates a proper exercise of discretion supported soundly by the evidence in the

record. Kendi is the presumed child of Harris because she was born during his marriage to Wilson. *See* Code, § 1–206 of the Estates and Trusts Article. Although Evans presented evidence of a sexual encounter with Wilson approximately one year before Kendi's birth and that Wilson wrote letters acknowledging Evans to be Kendi's father, that evidence does not necessarily overcome that presumption as a matter of law. Significantly, Wilson testified that her affair with Evans ended at least one month before Kendi was conceived, and, despite this admitted affair, the record amply supports the finding that Wilson's familial relationship with Harris and Kendi remains intact. Kendi, by all accounts, has bonded with Harris, whom she recognizes as her father and relies on to meet her financial, emotional, and health needs. Additionally, the evidence shows that, since Wilson's affair, she and Harris have lived together as a family, sharing meals, paying for Kendi's daycare, and enjoying recreation together on weekends. We cannot say that, based on this evidence, the trial judge abused her discretion in denying Evans' request for a blood or genetic test of Kendi.

## C. Due Process

As his final argument, Evans claims that, by refusing to order a paternity test of Kendi, the trial court violated his constitutional right to due process. Specifically, Evans maintains that he has a "constitutionally protected liberty interest in the opportunity to develop a relationship with his daughter" and that he was deprived of this interest without due process.

As a basis for this contention, Evans cites *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), a case that generally contradicts Evans' reading of the Constitution. The factual circumstances in *Michael H.* do not depart in any relevant manner from the case at bar. Michael had an adulterous affair with Carol while she was married to Gerald. *Id.* at 113, 109 S.Ct. at 2337, 105 L.Ed.2d at 100. Carol, while still married to Gerald, gave birth to a daughter, Victoria, and informed Michael that he might be the father. *Id.* at 113–14, 109 S.Ct. at 2337, 105 L.Ed.2d at 100. Having developed a

relationship with Victoria and believing himself to be her natural father, Michael petitioned for visitation rights. The California courts denied his request based in part on a statutory presumption of legitimacy. *Id.* at 115–16, 109 S.Ct. at 2338, 105 L.Ed.2d at 101.

Michael argued before the Supreme Court that the California statute creating a presumption of legitimacy was unconstitutional and that, under the Due Process Clause of the Constitution, he had a "constitutionally protected liberty interest in his relationship with Victoria." *Id.* at 121, 109 S.Ct. at 2341, 105 L.Ed.2d at 104–05. The Court, in a divided opinion, affirmed the state court's decision that the statutory presumption was constitutional. *Id.* at 132, 109 S.Ct. at 2346, 105 L.Ed.2d at 111. A plurality of the Court concluded that the Constitution did not recognize a right of the natural father to a relationship with his child who was born during the marriage of the child's mother to another man. The plurality explained that the decision rested "upon the absence of any constitutionally protected right to legal parentage on the part of an adulterous natural father in Michael's situation, as evidenced by long tradition." *Id.* at 129 n. 7, 109 S.Ct. at 2345 n. 7, 105 L.Ed.2d at 110 n. 7.

Justice Brennan authored a dissenting opinion and noted that, although only four justices believed that Michael had a "liberty interest in his relationship with Victoria," "[f]ive Members of the Court refuse[d] to foreclose the 'possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabitating with, another man at the time of the child's conception and birth.'" *Id.* at 136, 109 S.Ct. at 2349, 105 L.Ed.2d at 114 (Brennan, J., dissenting). Arguing that such a liberty interest does exist, Justice Brennan observed that the Supreme Court's opinions in these sort of cases:

produced a unifying theme: although an unwed father's biological link to his child does not, in and of itself guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. "When an unwed father demon-

strates a full commitment to the responsibilities of parent-hood by 'com[ing] forward to participate in the rearing of his child,' . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause."

*Id.* at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118–19 (quoting *Lehr v. Robertson,* 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983)).

In *Turner,* 327 Md. at 114, 607 A.2d at 939, we relied on the majority's decision in *Michael H.,* which, according to this Court, "held Michael H. had no constitutionally protected right to establish his paternity of Victoria." We also found Justice Brennan's opinion to be instructive, although we did not adopt it. *Id.* at 116, 607 A.2d at 940. Justice Brennan's discussion, we believed, highlighted why a "good cause" analy-sis was appropriate for determining whether to order paterni-ty testing of a child born during a marriage. *Id.; see also supra* at Section III A of this Opinion (discussing the "good cause" analysis advanced in *Turner* ). We reasoned that, in requiring a court to permit an individual's request for a blood test of a child born during marriage only upon a showing of good cause, the court "ought to be able to consider and balance the different interests that were separately recognized by the majority and the dissent in *Michael H.*" *Id.* at 116, 607 A.2d at 940.

█ Turning to the instant case, we disagree with Evans' argument that *Michael H.* confers upon him a protected liberty interest. Despite the diverging views expressed in *Michael H.,* neither the Supreme Court nor this Court has recognized any constitutionally protected liberty interest of an alleged biological father in developing a relationship with a child who was born while the mother was married to another man.[7] Moreover, Evans still could not prevail in this case

---

7. The dissent suggests that our interpretation of the Estates & Trusts Article and Family Law Article runs afoul the Equal Rights Amendment to the Maryland Declaration of Rights (ERA). Specifically, the dissent argues that requiring courts to consider the "best interests" standard in

situations like the case before us places a greater burden on the "male biological parent" than on the "female biological parent." The dissent's reliance on the ERA is misplaced.

The dissent misrepresents the nature of the interests at issue. This case is not about gender classifications; it is about the State's interests in preserving family unity and the best interests of the child. The State has a strong interest in protecting the integrity of the marital family unit and in promoting family harmony. *See Michael H.*, 491 U.S. at 125, 109 S.Ct. at 2343, 105 L.Ed.2d at 107; *Turner*, 327 Md. at 114–16, 607 A.2d at 939–40. Related to this is the State's longstanding policy in favor of protecting the best interests of the child. *See In re Mark M.*, 365 Md. 687, 705–06, 782 A.2d 332, 343 (2001); *Boswell v. Boswell*, 352 Md. 204, 218–19, 721 A.2d 662, 669 (1998); *In re Adoption No. 10941*, 335 Md. 99, 113, 642 A.2d 201, 208 (1994); *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 561, 640 A.2d 1085, 1096 (1994). As we discussed in Part A *supra*, examining the best interests of the child in a case such as this before ordering genetic testing allows for the protection of these important interests.

The dissent cites *Toft v. Nevada ex. rel. Pimentel*, 108 Md.App. 206, 671 A.2d 99 (1996) as support for the position that our holding in the present case violates the ERA. *Toft* is distinguishable on two grounds. First, the dissent mischaracterizes the holding in *Toft*. The dissent states that "the *Toft* court ruled that a mother could receive blood tests to rebut the presumption of legitimacy." Dissenting op. at 13. The issue in *Toft*, however, was not whether the mother could *receive* blood tests but whether the results of genetic testing—*already obtained*—could be used as evidence to rebut the presumption of legitimacy. The alleged father in *Toft* had submitted to paternity testing pursuant to an order, in a separately numbered case, that had been issued almost one year before the mother filed the action that was before the *Toft* court on appeal. *Toft*, 108 Md.App. at 211–12, 671 A.2d at 101–02. Nothing in the *Toft* opinion explains how the judge in that separately numbered case reached the conclusion that the mother, child, and alleged father must undergo paternity testing, and the Court of Special Appeals did not address whether the judge had erred in requiring such testing. *See id.* at 211 n. 2, 671 A.2d at 101 n. 2. Therefore, the dissent is wrong in asserting that the *Toft* court "ruled" that a mother could obtain genetic testing without the court first considering the best interests of the child.

Second, *Toft* is distinguishable on the facts. The mother in *Toft* remained married to the husband at the time of conception, but their family unit was hardly intact. The parties agreed that, during the period within which the child was conceived, the mother had been separated and living apart from her husband for at least four months. *Id.* at 210, 214, 671 A.2d at 101, 103. While separated, she had a sexual relationship with two other men and lived in California, Nevada, and Virginia at various times while her husband lived in Texas. *Id.* The mother never reunited with her husband, and they were divorced before the child was born. *Id.* at 210, 214 n. 5, 671 A.2d at 101, 103 n. 5. Ordering blood testing in these circumstances certainly would not damage any marital harmony and would, in addition, be in the best interests of the child.

even if we were to adopt Justice Brennan's view that a biological link to a child combined with a substantial parent-child relationship guarantee the natural father a relationship with the child. Quite simply, Evans and Kendi have not developed a "substantial parent-child" relationship. Evans has provided $80 worth of baby supplies as child support, visited Kendi only on several occasions, and has not seen the baby since she was six weeks old. This conduct does not demonstrate, as Justice Brennan would require, "a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child.'" *Michael H.*, 491 U.S. at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118–19 (Brennan J., dissenting).

Because Evans does not have a protected liberty interest in developing a relationship with Kendi, the Due Process Clause of the Constitution does not guarantee him any protection with respect to that relationship. The Circuit Court, therefore, did not violate the Constitution when it denied Evans' request for a paternity test.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

RAKER, J., dissenting:

I respectfully dissent. Brett Evans's request for a blood test to determine whether he is the biological father of Kendi should be granted. If the test reveals that he *is* the biological father, then the court should apply the "best interests of the

Nevertheless, as we made clear above, the intact family unit maintained by Wilson and Harris is very different from the broken relationship described in *Toft*. The record suggests that Wilson's sexual relationship with Harris concluded one month before Kendi was conceived and, since then, Wilson and Harris have lived together as husband and wife. Furthermore, since Kendi's birth, Harris has acted as her father, bonding with her and providing for her financially and emotionally. Based on these two clear distinctions, *Toft* is improperly cited as support for the dissent's view that paternity testing should be ordered whenever a man claims that he is the biological father of a child born to an intact marriage.

child" test to determine what, if any, legal rights he should be afforded as to Kendi.

The majority holds that when a man claims to be the father of a child born while the mother was married to another man, pursuant to the Estates & Trusts Article, the court may grant his request for a blood test only upon a showing of good cause. Maj. op. at 628. In determining whether good cause exists, the court must consider the best interests of the child. *Id.*

I disagree for several reasons. First, in my view, "good cause," under Rule 2–423, should be determined based upon an assessment of whether the request is material to some issue in the case. *See Roberts v. Roberts,* 198 Md. 299, 82 A.2d 120 (1951). Consideration of the "best interests of the child" has no place at this stage of the proceedings and comes into play only after the blood test has been performed. Second, an action to determine paternity may be brought under either Maryland Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) §§ 5–1001 through 5–1048 of the Family Law Article or under Maryland Code (1974, 2001 Repl.Vol., 2003 Cum.Supp.) §§ 1–206 and 1–208 of the Estates & Trusts Article. The Estates & Trusts Article is not the exclusive means for determining paternity but is merely an alternative means. As pointed out by Judge Eldridge in *Turner v. Whisted,* 327 Md. 106, 121, 607 A.2d 935, 943 (1992) (Eldridge, J., dissenting), "the paternity provisions of the Family Law Article were better designed to resolve disputes over the identity of the natural father." This is particularly so today, following the addition of § 5–1002(c) to the Family Law Article in 1997 since *Turner* was decided.

Until *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992), a person in Maryland could seek a declaration of paternity under the Family Law Article *or* the Estates & Trusts Article. *See Taxiera v. Malkus,* 320 Md. 471, 578 A.2d 761 (1990). *Turner* arbitrarily decided that "when two men each acknowledge paternity of the same child ... an action to establish paternity is more appropriately brought under the Estates & Trusts Article," on the ground that the Estates & Trusts Article presents the "more satisfactory" and "less traumatic"

means of establishing paternity.[1] 327 Md. at 113, 607 A.2d at 939. Under *Turner,* upon a motion for good cause shown, the court has the discretion to order a blood test pursuant to Rule 2–423, which provides that a court may order an examination "[w]hen the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy." *Id.* at 113–14, 607 A.2d at 939. The *Turner* court held that "the determination of good cause *allows* the court discretion to consider the best interests of the child." *Id.* at 115, 607 A.2d at 940 (emphasis added). In reality, however, the *Turner* court did not simply allow the court to consider the best interests of the child, but instead mandated that the court consider the best interests of the child before a blood test is ordered. *Id.* at 116, 607 A.2d at 940. "Good cause" simply requires that the request be material to some issue in the case. The request in this case is undeniably material to the issue in the case, that is, the paternity of Kendi.[2]

---

1. Judge Eldridge, joined by Judge McAuliffe, concurred and dissented, on two grounds. First, Judge Eldridge disagreed with the majority's view that the Estates & Trusts Article was the better statute for resolving paternity issues. Second, on the merits, Judges Eldridge and McAuliffe held the view that the putative father was entitled to blood tests and that he did not have to establish that a declaration of paternity was in the child's best interests before blood tests should be ordered. *Turner v. Whisted,* 327 Md. at 118, 607 A.2d at 941 (Eldridge, J., concurring and dissenting). The dissent pointed out that:

> "[t]he fact of biological parentage does not automatically entitle the natural father to visitation with his child. A determination of paternity would entitle the natural father to the presumption that the child's interests will be served by allowing the father visitation. Yet, this presumption can be rebutted when some exceptional circumstances render such custody [or visitation] detrimental to the best interests of the child."

*Id.* I agree with the dissent completely.

2. This is not a case where a third party blithely asserts that he is the father of a child born to a married woman. Evans and Wilson had a sexual relationship, beginning in March 2001. Evans regularly spent nights at Wilson's home, and attended a baby shower in November 2001. Evans received mail from Wilson, and his parents visited Kendi at the hospital on the day that she was born. Wilson prepared a birth announcement indicating that Evans was the father, and on Valentine's Day, when Kendi was one month old, Wilson sent Evans a card

I cannot subscribe to a view that precludes the discovery of the true facts, undeniably ascertainable and reliable.[3] I agree fully with the philosophy repeatedly expressed by Judge Eldridge, and articulated by him in *Monroe v. Monroe,* 329 Md. 758, 783, 621 A.2d 898, 910 (1993), that "under the majority's approach, sometimes the most relevant facts will not be ascertained in order to prevent what a court may regard as an unsatisfactory resolution of the dispute." To reiterate his analysis set forth in *Turner:*

"The majority has formulated a procedure whereby the trial court must determine the ultimate result, in order to discover whether that result is satisfactory, before it can ascertain the facts. If the court decides that it likes the predicted ultimate result, then the fact finding process continues. If the court decides that it does not like the predicted ultimate result, the process ends. I cannot subscribe to the proposition that relevant, ascertainable evidence should be excluded because it may lead to a result which the court does not like. The trial court's conjecture over whether the result will be satisfactory should not determine whether facts relevant to that result are concealed. I simply cannot agree with the majority's view that a government (through its courts) is entitled to determine in a particular case that one will be

---

identifying him as "Daddy." Evans visited with Kendi and bought her clothes, diapers and toys.

**3.** As pointed out by the Supreme Court of Nebraska, in *B.H. v. K.D.,* 506 N.W.2d 368 (N.D.1993):

"The result of the test is universally accepted by distinguished scientific and medical authority. There is in fact, no living authority of repute, medical or legal, who may be cited adversely ... There is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity."

*Id.* at 382 (quoting S. Schatkin, *Disputed Paternity Proceedings* § 5.03 (1975)).

better off by the perpetuation of a falsity and the suppression of relevant, unprivileged facts."

327 Md. at 123–24, 607 A.2d at 944.

Although the Court may think it "preferable" to bring a paternity action under the Estates & Trusts Article, the Family Law Article remains an alternate avenue to determine paternity, and as I have stated, the preferable statute. Section 5–1002(c) of the Family Law Article, which was added to the Paternity Act in 1997 by the General Assembly, states as follows:

> "*Establishment of Paternity.*—Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child."

Under § 5–1029 of the Family Law Article, a putative father is entitled to a blood or genetic test to determine paternity. The "best interests" analysis plays no role in determining whether the test should be ordered. *See Langston v. Riffe,* 359 Md. 396, 437, 754 A.2d 389, 411 (2000).

Evans is a "putative father" under the Family Law Article, and arguably, Kendi is a child "born out of wedlock," notwithstanding the fact that she is "legitimate." [4] Evans points out

---

4. First, all children are legitimate. Second, under the statutory presumption, Kendi is "legitimate," even though there may arise competing presumptions, *i.e.*, the statutory presumption of "legitimacy" versus the presumption that might arise if Evans is proven to be the biological father.

The Court of Appeal of Florida for the second district made a cogent distinction between legitimacy and paternity. *See Daniel v. Daniel,* 681 So.2d 849 (Fla.App.1996). The court reasoned as follows:

"We believe confusion has arisen in the law because of a failure to distinguish between paternity and legitimacy. The presumption of legitimacy is one of the strongest rebuttable presumptions known in the law ... The American Heritage College Dictionary 1001 (3d ed.1993), defines paternity as 'the state of being a father; fatherhood ... a woman attempting to establish that a particular man is the father of her child ...' Only one person can be the biological father of a child. The American Heritage College Dictionary 775 (3d ed.1993), defines legitimate as 'being in compliance with the law; lawful ... Born to legally married parents.' Paternity and legitimacy are related concepts, but nonetheless separate and distinct concepts."

*Id.* at 851–852.

that "putative" fathers have far greater rights today than they enjoyed when *Turner* was considered because of the addition of § 5–1002(c) to the Family Law Article. Maj. op. at 629–30. Although agreeing with Evans that putative fathers have expanded rights, the majority dismisses Evans's argument by concluding that "the expanded rights to which he refers do not apply to individuals in his position." *Id.*

The majority adopts the reasoning of the court set out in *Stubbs v. Colandrea*, 154 Md.App. 673, 841 A.2d 361 (2004) in dismissing Evans' claim. *See* maj. op. at 632–34. Using Black's Law Dictionary as the definitive source, bolstered by the stated purpose of the Paternity Act and the legislative history of § 5–1002(c), the *Stubbs* court construed the term "putative father" in § 5–1002(c) to mean a person who has fathered a child out of wedlock. 154 Md.App. at 684, 841 A.2d at 367. The *Stubbs* court then interpreted "a child born out of wedlock" to refer only to a child born to an unwed mother and denied that a man who claims to be the father of a child while the mother is married to another man has rights under § 5–1002(c) to bring a paternity suit. *Id.* at 689, 841 A.2d at 370.

Although the primary impetus for the enactment of § 5–1002(c) of the Family Law Article may have been to implement the federal mandate requiring each state to have in effect laws to increase the effectiveness of child support enforcement, that is not the exclusive purpose of the statute. The Bill Analysis of Senate Bill 636 sets out eleven changes effectuated in State law by the bill.[5] Many of the changes are

---

5. The Bill Analysis of Senate Bill 636 sets out the changes to State law that are included in the bill as follows:

"Making it mandatory, rather than voluntary, for an applicant for a marriage license to give the social security number of each party;
- Expressly authorizing a putative father to file an action to establish his paternity of a child;
- Eliminating an alleged father's right to a jury trial in a paternity action;
- Establishing that an affidavit of parentage constitutes a legal finding of paternity, rather than a rebuttable presumption;
- Allowing a legal finding of paternity established by affidavit to be set aside only if it is rescinded within 60 days or, after the expiration of

obviously designed to improve child support, such as making it mandatory to provide the social security number of each party to a marriage license, requiring court-ordered temporary support orders in certain circumstances, and changing the presumptions in paternity findings by affidavit. But expressly authorizing a putative father to file an action to establish his paternity of a child and mandating blood tests to the putative father upon request is not limited solely to improving the effectiveness of child support enforcement. Paternity proceedings are designed to protect the welfare of the child. *E.R.B. v. J.H.F.*, 496 A.2d 607, 611 (D.C.App.1985). Since the primary purpose is to provide support for the child, and although Kendi at the present moment is receiving support from Wilson's husband, there may come a time in the future when he will refuse to support the child, perhaps claiming that he is not the natural father. Moreover, there are many other

---

> the 60–day period, the party challenging it proves that the affidavit was executed because of fraud, duress, or a material mistake of fact;
> - Authorizing the Child Support Enforcement Administration (CSEA) to require any individual to submit to blood or genetic tests to determine paternity;
> - Making written statements concerning the cost of a blood or genetic test and records relating to the cost of the mother's medical and hospital expenses and the child's neonatal expenses admissible in evidence in a paternity action without the presence of the custodian of the records and establishing that the statement or record constitutes prima facie evidence of the amount of expenses incurred (subject to a party's right to subpoena the custodian at least 10 days before trial);
> - Requiring the court in a paternity action to pass a temporary child support order if the laboratory report of a blood or genetic test establishes a statistical probability of paternity of at least 99% and the putative father has the ability to pay;
> - Amending the State new hire reporting law to require reporting of additional employment information required for the National New Hire Registry;
> - Providing immunity for employers, public service companies energy providers, financial institutions, and labor unions that comply with requests for information from the CSEA; and
> - Requiring the CSEA to establish a State disbursement unit for collection and disbursement of support payments in specified cases effective October 1, 1998, and requiring the Executive Director to report to the General Assembly on or before December 1, 1997 on the implementation of the State disbursement unit."

reasons that a child may benefit from the knowledge of the identity of the biological father.

The term "putative father" is broader than the definition of the majority and the *Stubbs* court and includes a person claiming to be the father of a child born in an extant marriage. The United States Supreme Court and Maryland cases have used the term "putative father" to refer to a man who claims to be the father of a child born while the mother is married to another man. *See, e.g., Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); *Sider v. Sider,* 334 Md. 512, 639 A.2d 1076 (1994); *Monroe v. Monroe,* 329 Md. 758, 621 A.2d 898 (1993).

Further, a review of the case law from our sister states reveals that many states use the term "putative father" in this manner. For example, *Kelly v. Cataldo,* 488 N.W.2d 822, 825 (Minn.App.1992), discusses a paternity action under Minnesota's Parentage Act. The intermediate appellate court referred to a man as the "putative father" who was seeking parental rights with a child who was conceived and born while the mother was married to another man. *Kelly v. Cataldo,* 488 N.W.2d at 828; *see also Ban v. Quigley,* 168 Ariz. 196, 812 P.2d 1014 (1990); *R.N. v. J.M.,* 347 Ark. 203, 61 S.W.3d 149 (2001); *In re Jonathan M.,* 255 Conn. 208, 764 A.2d 739 (2001); *Weidenbacher v. Duclos,* 234 Conn. 51, 661 A.2d 988 (1995); *Preston v. Cummings,* 871 So.2d 1055 (Fla.App.2004); *K.S. v. R.S.,* 669 N.E.2d 399 (Ind.1996); *C.C. v. A.B.,* 406 Mass. 679, 550 N.E.2d 365 (1990); *In re KH,* 469 Mich. 621, 677 N.W.2d 800 (2004); *Ivy v. Harrington,* 644 So.2d 1218 (Miss.1994). The restrictive definition formulated by the majority is unwarranted, unsupported, and result-oriented.

The definition ascribed to "born out of wedlock" is also important. The majority and the *Stubbs* court simply assume that "out of wedlock" has only one meaning—a child born to an unwed mother. Courts around the country have considered the meaning of this language and have interpreted the phrase to mean either a child born to an unmarried mother or a child born to a married woman but fathered by a man other

than the mother's husband. *See, e.g., In re Legitimation of Locklear,* 314 N.C. 412, 334 S.E.2d 46, 50–51 (1985). In *Locklear,* the North Carolina Supreme Court considered the meaning of the phrase and concluded as follows:

"Our research indicates that the phrase, 'born out of wedlock,' should refer 'of the status of the parents of the child in relation to each other.' *Pursley v. Hisch,* 119 Ind.App. 232, 235, 85 N.E.2d 270, 271 (1949). A child born to a married woman, but begotten by one other than her husband, is a child 'born out of wedlock'. . . *Id.* citing *State v. Coliton,* 73 N.D. 582, 17 N.W.2d 546 (1945). This same interpretation of the phrase is also consistent with the position taken by the Uniform Act on Paternity, § 1, 9A U.L.A. 626 (1979) (act withdrawn 1973), which states, 'A child born out of wedlock includes a child born to a married woman by a man other than her husband.' Finally, the Uniform Illegitimacy Act of 1922, § 1, 9 U.L.A. 391 (1942) (act withdrawn 1960) interprets the term 'wedlock' as referring 'to the status of the parents of the child in relation to one another.' S. Schatkin, I. Disputed Paternity Proceedings § 1.01, at 1–2 (rev. ed.1984). The alleged parents of Stanley Locklear, Petitioner herein and Stanley's mother, in their relation to one another, did not acquire the status of wedlock. Thus, the minor child was 'born out of wedlock, although his mother was married to another man, not his natural father.' "

Id.

Many other courts have adopted the definition of "out of wedlock" to mean a child born to an unmarried woman and one born to a married woman but having a father other than the mother's husband. *See, e.g., County of Lake v. Palla,* 94 Cal.App.4th 418, 114 Cal.Rptr.2d 277 (2001); *Lewis v. Schneider,* 890 P.2d 148 (Colo.App.1994); *Estey v. Mawdsley,* 3 Conn.Cir.Ct. 491, 217 A.2d 493 (1966); *Wilkins v. Georgia Department of Human Resources,* 255 Ga. 230, 337 S.E.2d 20 (1985); *Johnson v. Studley–Preston,* 119 Idaho 1055, 812 P.2d 1216 (1991); *Pursley v. Hisch,* 119 Ind.App. 232, 85 N.E.2d 270 (1949); *Girard v. Wagenmaker,* 173 Mich.App. 735, 434

N.W.2d 227 (1988); *Martin v. Lane*, 57 Misc.2d 4, 291 N.Y.S.2d 135 (N.Y.Fam.Ct.1968), *rev'd sub nom. on other grounds; State v. Coliton*, 73 N.D. 582, 17 N.W.2d 546 (1945); *Baker v. Munro*, 71 Or.App. 164, 692 P.2d 126 (1984). The Idaho Supreme Court considered the meaning of the phrase, noted the common definition, and adopted the broader one. *Johnson v. Studley–Preston*, 119 Idaho 1055, 812 P.2d 1216 (1991). The court stated as follows:

"[The Idaho statute] 7–1103 defines 'child born out of wedlock' as 'a child who is begotten and born outside of lawful matrimony.' While this phrase has commonly been construed to mean only a child born to an unmarried mother, it is susceptible to another interpretation. Many jurisdictions have interpreted the phrase 'child born out of wedlock' to mean either a child born to an unmarried mother or a child born to a married woman but fathered by a man other than the mother's husband.... We agree with the above authorities and hold that § 7–1103, which defines 'child born out of wedlock' as 'a child who is begotten and born outside of lawful matrimony,' refers to either a child born to an unmarried woman or a child born to a married woman but who was conceived by a man other than the mother's husband. This interpretation is consistent with the remaining sections contained in the Idaho Paternity Act."

*Id.* at 1219.

The term "putative father" in the Family Law Article includes a man who claims to be the biological father of a child where the mother is either unmarried or where the child was conceived by a man other than the woman's husband. This construction is mandated not only because it is fair and makes sense, but also because it is required under the Equal Rights Amendment of the Maryland Constitution. Article 46 of the Maryland Declaration of Rights, known as the Equal Rights Amendment (E.R.A.), was adopted in Maryland in 1972 and provides as follows:

"Equality of rights under the law shall not be abridged or denied because of sex."

In *Rand v. Rand,* 280 Md. 508, 515–16, 374 A.2d 900, 904–905 (1977), this Court established that the Equal Rights Amendment forbade gender based discrimination and that the people of Maryland were fully committed to equal rights for men and women. We reiterated in *Burning Tree Club, Inc. v. Bainum,* 305 Md. 53, 64, 501 A.2d 817, 823 (1985), that "the E.R.A. flatly prohibits gender-based classifications, either under legislative enactments, governmental policies, or by application of common law rules, in the allocation of benefits, burdens, rights and responsibilities as between men and women."

It is a violation of the Equal Rights Amendment if a greater burden is placed on the male biological parent to rebut the presumption of legitimacy than on the female biological parent. *See R.McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666 (1980). State statutes that employ gender-based classifications such as:

"[e]xclusive statutes, which allow the mother, husband and child to rebut the marital presumption, but deny this ability to all putative fathers do not withstand this scrutiny. First, while not immediately obvious, such statutes employ a gender-based classification.... Exclusive statutes employ three classifications of persons: biological parents, presumed fathers and children. Within the biological parent classification, exclusive statutes discriminate on the basis of gender: only women may rebut the presumption."

Traci Dallas, *Rebutting the Marital Presumption: A Developed Relationship Test,* 88 Columbia L.Rev. 369, 379–80 (1988). Applying the majority's reasoning in the instant case causes the "Paternity Proceedings" subtitle of the Family Law Article to fall within the classification of an exclusive statute because it permits the biological mother to bring a suit to rebut the presumption of legitimacy, whereas it does not allow this same right to a man claiming to be the biological father. Currently, a woman can bring a paternity action under the Family Law Article to rebut the presumption that her husband is the father of her child. *See Toft v. State of Nev. ex rel. Pimentel,* 108 Md.App. 206, 223–224, 671 A.2d 99, 107–108 (1996). But a man claiming to be the biological father is

required to bring a paternity action under the Estates & Trusts Article to rebut the presumption that the mother's husband is the father of the child. *See Turner,* 327 Md. at 113, 607 A.2d at 938.

A man claiming to be the biological father of a child is more significantly burdened than the biological mother if he wishes to rebut the presumption of legitimacy. Section 5–1027(c) of the Family Law Article in effect permits the natural mother to seek a declaration of paternity in a man who is not her husband, and thereby undo the state's interest in preserving family stability. Moreover, the *Toft* court ruled that a mother could receive blood tests to rebut the presumption of legitimacy contained in § 5–1027(c) of the Family Law Article. 108 Md.App. at 225, 671 A.2d at 108. The *Toft* court did not condition the natural mother's right to seek a declaration of paternity and to receive blood tests on consideration of the child's best interests. Yet, a non-spouse claiming to be the biological father is required to bring suit under the Estates & Trusts Article to establish paternity and to rebut the presumption that the mother's husband is the father. *See Turner,* 327 Md. at 113, 607 A.2d at 938. Moreover, under the Estates & Trusts Article, the court will not allow the man's request for a blood test unless and until it finds that it is in the best interests of the child to conduct the test. This leads to the biological mother securing blood tests without any qualifications, whereas the man claiming to be the biological father cannot receive the same unless the court finds that it is in the best interests of the child to grant the request for the test. This result is really no different than that found by the Colorado Supreme Court in *R.McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666, 671 (1980):

> "that Section 19–6–107(1) [of Colorado's Uniform Parentage Act] exemplifies a gender-based classification predicated on an overbroad generalization that a mother has a legitimate interest in establishing a determination of paternity in a non-spousal father, while such father has no interest in establishing a determination of paternity in himself."

The ramifications of today's decision may lead to some unfortunate results. Assume that sometime in the future, Harris, Wilson's husband, asserts that he is not the father of Kendi and refuses to support her. Neither Kendi nor Harris were parties to this action.[6] Would Wilson be permitted to bring an action against Evans? If so, why should Evans not be permitted to bring the action today? Also, if Kendi should need a bone marrow transplant or needs to ascertain genetic information for medical treatment in the future, she will have been denied the benefit of the critical genetic information that Evans is seeking to make available at this time. What happens if these scenarios arise and Evans is no longer alive? Policy and logic require that the court order the blood tests requested by Evans.

---

**6.** Although no one has raised the issue, I believe that the action should have been dismissed for failure to join Kendi and Harris as necessary parties.